**Hans ZIMMERMAN and Clara D. Zimmerman, Plaintiffs,**

v.

**The UNITED STATES of America, and the Director of Internal Revenue for the Territory of Hawaii, Defendants.**

Civ. No. 1652.

United States District Court
D. Hawaii.

July 20, 1962.

Kenneth E. Young, Honolulu, Hawaii, for plaintiffs.

Herman T. F. Lum, U. S. Atty., District of Hawaii, for defendants.

PENCE, Chief Judge.

For some years before December 7, 1941, Dr. Hans Zimmerman was a naturopathic physician practicing his profession in Honolulu. At the outbreak of the war, he was immediately interned by the United States Army, and was thereafter shipped to the mainland United States where he settled in Chicago, Illinois.

Because, while in Honolulu, Dr. Zimmerman had had disagreements with the American Medical Association concerning certain legislation and because he was "interested in preserving our profession", as he testified, in 1943 he conceived the idea of getting certain healing professions, viz.: naturopaths, homeopaths, allopaths and osteopaths, to work together on a national scale for the preservation of their professional rights and standings in the face of the opposition of the American Medical Association; to set up a school to teach the arts of those several professions; and to work together towards gaining more recognition and better legislative treatment from the various States. He also said that he expected to establish a hospital in Honolulu with all the healing arts represented. So, in the early spring of 1944, the National Medical Society was founded, with Dr. Hans Zimmerman as its first President. Shortly after its formation, he was elected Executive Secretary, a position which he continued to hold until 1949, when he became Chairman of the Board. As is shown by the letter of Francis J. Leahy, of May 14, 1955, addressed To the Officers and Members of the National Medical Society, the Journal of the National Medical Society, Vol. 1, No. 3, Page 91, "Dr. Zimmerman had an idea, and he toiled day and night to put his idea into effect.

Besides unselfishly devoting his whole time, he also made financial contributions so that the seeds could be sown, which have borne fruit with the growth of the National Medical Society * * * let our slogan be 'New Members,' and repay a debt of gratitude to Dr. Hans Zimmerman."

In the beginning, the Society had no funds, so Dr. Zimmerman offered to advance the money necessary to carry on the business of the organization until the organization could carry itself. He said that he expected repayment from the dues of the members, but a specific time for repayment was never mentioned.

Dr. Zimmerman devoted most of his own time in organizational work, and travelled extensively on behalf of the Society in securing new members, organizing chapters, and endeavoring to start the school for the allied professions at the University of Tampa, Florida. The Society also undertook to publish a journal (above named), of which Dr. Zimmerman was the editor.

During the years 1944 and 1945, Dr. Zimmerman made substantial advances towards the expenses of running the office and business of the Society and paying for his travels. In 1946, Dr. Zimmerman returned to Hawaii to resume his practice. He continued, however, actively to promote the Society and to make cash advances to the Society because, apparently, at no time was the Society self-supporting. Between 1944 and 1955, Dr. Zimmerman advanced to or paid out for the Society some $50,000. Dr. Zimmerman testified that the Society had repaid him $10,000, at what time was not specified. In 1946, he contributed $5,000 to the educational fund of the Society and the establishment of a medical school, and as appears in Vol. 3, No. 1, of the January-March 1947 issue of the Society's Journal, on Page 21, Dr. Zimmerman himself wrote that the money donated to the education fund "is earmarked for our school project and will be refunded if lack of interest in our proposed school makes its materializa-

tion unattainable." The school was never established.

In any event, at the end of 1955, it appeared that there was still $41,247.73 which had been advanced (Mrs. Zimmerman had made small "advances") to the Society, which the Society had not repaid.

Although Dr. Zimmerman testified that it was expected that the Society would have 50,000 members, at the end of 1945, there was not over 100 regular dues-paying members.

In his 1946 tax return, Dr. Zimmerman indicated that he had *"contributed"* $5,000 to the Society. This sum was included in the $41,247.73 above referred to, as were the following similarly listed "contributions" on his and his wife's joint tax returns: in 1951, $3,000; in 1952, $1,000; in 1953, $1,000; in 1955, $2,100. There was no specific correlation between actual advances and "contributions" reported in the 1951, 1952, 1953 and 1955 income tax returns. For example, in 1951 Dr. Zimmerman advanced $1,683.22 to the Society, but plaintiffs' tax return for that year reported that the "contribution" to the Society had been $3,000. In 1952, he advanced $963.05 and plaintiffs' tax return for that year showed a "contribution" to the Society of $1,000. In 1953 and 1954, he advanced $1,153.95 to the Society and plaintiffs' tax return showed a "donation" to the Society in 1953 of $1,000. In 1955 he advanced but $51.25 to the Society and plaintiffs' tax return for that year showed a "contribution" to the Society of $2,100.

A report to the Society from the accounting firm of Peat, Marwick and Mitchell showed that as of December 31, 1949, although there was supposed to be $2,952 due from members, uncollectible dues amounted to $2,362, leaving the actual number of members who were truly expected to pay their $10.00 annual dues at but 59 ($590.00). At that time, Dr. Hans Zimmerman "confirmed" to the accountants that the Society owed the plaintiffs $32,518.72—while the *total*

assets of the Society were but $5,706.97. During the same year of 1949, when the membership fees and dues collected, together with advertising in the Journal and subscriptions and car emblems and buttons sold, amounted to only $1,429.00, the plaintiffs advanced $11,694.70 to the Society; in 1950, the plaintiffs advanced an additional $8,852.64; and in 1951, $1,683.22. In 1952, the advance was $963.06; in 1953 and 1954, the total advanced was $1,153.95; and the final $51.-25 was advanced in 1955.

The actual regular dues-paying membership of the Society apparently never, at any time, exceeded over three low figures. All of this was known to Dr. Zimmerman at the times he was making his advances.

In 1956, the Internal Revenue Service rejected the deductions taken by the plaintiffs for the "contributions" and "donations", maintaining that the Society was a business league and not a type of organization to which contributions could be deducted for tax purposes.

Dr. Zimmerman testified that he definitely determined in the year 1955 that there was no hope of ever recovering the $41,247.73 and therefore claimed the entire amount as a business bad debt. This position was rejected by the Internal Revenue Service, and the plaintiffs, husband and wife, filing joint tax returns, brought this action against the United States of America for recovery of the income taxes which the plaintiffs claim were illegally assessed and collected from them. The defendant claims that the monies paid to the National Medical Society were contributions and gifts, and in any event did not constitute either a business or non-business debt deductible under Section 166 of the 1954 Internal Revenue Code as a bad debt.

The first question to be determined is whether there was ever a valid enforceable debt due Dr. Zimmerman from the Society. The Society's minutes show that on April 5, 1944, Dr. Zimmerman "offered to advance the finances necessary to set up administrative headquar-

ters", and the subsequent minutes show that he was authorized to and did travel all over the United States setting up local chapters, investigating the Hoxsey cancer treatment, etc., and on July 18, 1954, it was unanimously agreed that the Society should reimburse the "expenses advanced by Executive Secretary, Dr. Hans Zimmerman amounting to $10.00 per day, and traveling expenses for administrating the affairs of the N.M.S." On August 1, 1945, the minutes show a complaint that Dr. Zimmerman had spent the expense money too lavishly in promoting the welfare of the Society which he had "provided * * * as he saw fit and which he expected the Society to return to him." Then appears the following: (the) "legal adviser explained our liability relative to same and it was agreed that as the Society was able that after an accounting of monies spent, what was coming to Dr. Zimmerman, should be gradually repaid. This seemed agreeable to all under conditions as presented." Dr. Zimmerman was present at this meeting!

As of August 7, 1945, the accountants' record shows that there was then due Dr. Zimmerman $5,538.55 for money advanced by him to the Society. At that time, there was a deficit of expenses over income of $3,963.89. By October 2, 1945, all cash advanced by Dr. Zimmerman had reached $6,491.00. On October 20, 1945, the motion was passed, unanimously, at the Business Meeting of the "First Annual Convention" that "Dr. Zimmerman be repaid the monies (he) advanced to the society at the earliest opportunity." The records for the years between 1945 and 1949 were not available, but Dr. Zimmerman's advances continued until, as stated above, at the end of 1949 he claimed $32,518.72 was due him from the Society.

Dr. Zimmerman testified: " * * * the minutes of the meetings reveal the subject, but primarily I offered to advance the money until the time when the organization could carry itself financially, and then that the organization should repay me at whatever amount

that was possible without jeopardizing the organization." The evidence is conclusive that the members and directors of the Society were filled with good intentions to repay Dr. Zimmerman for the monies he had advanced, but the records, as well as Dr. Zimmerman's testimony, unequivocally show that there was *never* any specific time or manner in which these monies should be repaid him. The records also clearly indicate that year after year Dr. Zimmerman continued to advance monies far in excess of the income of the Society—long after, with his inside knowledge of the financial affairs of the Society, he could have ever reasonably believed that there was any possibility—let alone probability—of repayment.

There was never any specific date by which any of the monies advanced by him were to be repaid, the "contingency" upon which it was to be repaid—if at all—was as stated by the Doctor and as set forth in the minutes: when and if the Society was able, he should be repaid, gradually, at the earliest opportunity, whatever amount the Society found possible to repay, without jeopardizing its financial condition. The contingency, loose and indefinite as it was, never did occur, and at no time could the Society have been forced by Zimmerman, on the specific circumstances above indicated, to repay the same to him. The fact that he, himself, reported the advances from time to time as "donations" and "contributions", coupled with the fact that he continued to make advances in very substantial amounts, far, far in excess of the Society's income, without receiving any note or any other evidence of indebtedness—even by way of records in the minutes—of the Society's promise to repay him, all indicate that he never actually expected, but rather only hoped, to be repaid any of the monies which he continued to advance.

## CONCLUSIONS OF LAW

It is well settled that tax deductions are a matter of legislative grace and that a particular deduction will be allowed only where the deduction claimed clearly falls within the provision in the statute. Milton Bradley Co. v. U. S., 146 F.2d 541 (1st Cir.).

For Federal tax purposes, a debt has been defined as "an unconditional and legally enforceable obligation for the payment of money." C. I. R. v. McKay Products Corp., 178 F.2d 639. Thus the *sine qua non* of a debt is the absolute obligation to pay. A reasonably fixed maturity date is also an essential element of a business debt; there must be an expectation that the so-called debt would be repaid at a determinable time. 4 Maertens Law of Federal Income Tax, § 21.10c. Birdsboro Steel Foundry & Machine Company v. U. S., 3 F.Supp. 640, 78 Ct.Cl. 100. While some variation from the classic debt situation is not fatal to the taxpayer's effort to have the advances treated as a debt for tax purposes, too great a variation will preclude such treatment. Gilbert v. C. I. R., 248 F.2d 399, 406 (2nd Cir.).

The liability to pay in the future, contingent upon something which may or may not occur, does not create a "debt", and the taxpayer may not treat as worthless debt amounts which are at a particular time merely contingent liabilities. Milton Bradley Co. v. U. S., supra. In Dallas Rupe & Son, 20 T.C. 363, 1953, urged by the plaintiffs as supporting their claim, Judge Black found that a debt existed because the repayment of the advance to the Dallas Symphony was not dependent upon the happening of any contingency, and that there was a reasonable assurance at the time the 1948 loan was made that reimbursement would be forthcoming.

In determining whether a "debt" within the meaning of the Code ever existed between the Society and Dr. Zimmerman, the intention of the parties, and all circumstances surrounding the transaction, must be analyzed. Nomenclature, though relevant, is far from conclusive, for a man may pay money for another's use, from which a promise to repay is normally inferred, without in fact mean-

ing to create a debt. Here there was no definite date for the repayment of the money advanced to the Society. Both Dr. Zimmerman and the Society understood and agreed that the advances were to be repaid only when, as and if the same could be done without jeopardizing the growth or existence of the Society. Dr. Zimmerman, himself, treated his advances, in part at least, as "contributions" and "donations" and he continued so to advance, contribute and donate during all the very years for which he now contends he should be permitted to claim these same advances, donations and contributions as a business bad debt.

Likewise, where the advances are made under such circumstances as to negative any reasonable expectation of repayment, then even though obligations might constitute valid indebtedness for other purposes, they are not "debts" within the meaning of the Internal Revenue Code, 26 U.S.C.A. § 166. Gilbert v. C. I. R., supra. If the putative lender knows that the borrower is without resources and likely never to have any, it may be reasonable, with nothing further, to assume that he merely means to give the money, and no "debt" would result. Shiman v. C. I. R., 60 F.2d 65 (2nd Cir.). Here, judging from the financial condition of the Society, through the 11 years that Dr. Zimmerman kept it in business, he could not reasonably, at any time, have expected that he would be repaid.

Also, where, as here, no attempt is made to enforce collection, such factor tends to support an inference that at the time the advances were made, the parties did not truly intend that they should give rise to enforceable debts.

From the above analysis, it clearly appears that none of the normal indicia of a classic debt appear in this case, save and except that Dr. Zimmerman claimed, and the Society acknowledged, an obligation for the money he advanced to it. Even if these advances could be held to be a debt, they could not be held to be business debts because Dr. Zimmerman clearly stated and his "editorials" in the

Journal show that he sparked the organization of the National Medical Society for the benefit of *all* the healing professions outside of the American Medical against the Association which led him to carry on with his intensive and time-consuming organizational work of his pet project—the National Medical Society.

As above indicated, the Court is satisfied that the obligation of the National Medical Society to Dr. Zimmerman does not fit into any of the accepted definitions of a "debt", either business or non-business, within the meaning of the Internal Revenue Code.

The plaintiffs having failed to sustain their burden of showing that the deductions clearly were bad debts within the meaning of the Internal Revenue Code, let Judgment be entered for the defendant.