Estate of Robert Treat Paine, Deceased, Francis Cummings, Executor v. Commissioner.
Estate of Paine v. Commissioner
Docket No. 90015.
United States Tax Court
T.C. Memo 1963-275; 1963 Tax Ct. Memo LEXIS 69; 22 T.C.M. (CCH) 1383; T.C.M. (RIA) 63275; October 7, 1963
*69 During the years 1948 through 1953, the present decedent made regular weekly payments of from $125 to $300, totaling $82,541, to a woman, her sister and her brother, pursuant to an agreement that repayment of the same to the decedent would be made only when, if and to the extent that the woman-payee should thereafter derive proceeds, by judgment or settlement or otherwise, from a certain lawsuit which she had filed and which was pending throughout the years that the payments were made. In 1954 said lawsuit and all appellate proceedings in respect thereto finally terminated, adversely to said woman-payee without her recovering any proceeds therefrom; and no repayment of any portion of said payments was ever made to the decedent. The decedent claimed a deduction for the year 1954 for a nonbusiness bad debt in the total amount of said payments. Held, that since repayment to the decedent was contingent and conditional upon the woman-payee's realization of proceeds from the lawsuit and this event never occurred, no debtor-creditor relationship and no "debt" within the meaning of section 166 of the 1954 Code ever came into existence; and hence, no existing debt "became worthless" in *70 1954, and no deduction for a nonbusiness bad debt is allowable for said year. Principles of Evans Clark, 18 T.C. 780, aff'd. (C.A. 2) 205 F. 2d 353, and other cited cases, followed. Harold Brown, 85 Devonshire St., Boston, Mass. for the petitioner. Albert R. Doyle, for the respondent. PIERCE
Memorandum Findings of Fact and Opinion PIERCE, Judge: Respondent determined deficiencies in the income taxes of the decedent, Robert *71 Treat Paine, for the years 1954 through 1958 as follows: Year
Deficiency
1954
$1,241.75
1955
2,520.79
1956
9,460.58
1957
447.11
1958
168.84
The sole issue for decision is whether, in the taxable year 1954, the decedent sustained a deductible nonbusiness bad debt loss, within the meaning of section 166(d) of the 1954 Code, in respect of certain cash payments which he had made to three individuals during the preceding years 1948 through 1953. The deficiencies determined for the other years 1955 through 1958 resulted from respondent's disallowance of claimed capital loss carryovers in respect of the alleged 1954 bad debt above mentioned; and the allowability of such carryovers is dependent upon the outcome of the issue above stated. Findings of Fact Some of the facts have been stipulated. The stipulation of facts and all exhibits identified therein are incorporated herein by reference. Robert Treat Paine (herein called the "decedent") died a resident of the State of Massachusetts on August 19, 1961, at the age of 96 years. The petitioner herein, Francis Cummings, is the duly appointed and acting executor of the decedent's last will and testament. The *72 decedent's income tax return for each of the taxable years 1954 through 1958 was filed on a cash and calendar year basis with the district director of internal revenue for the district of Massachusetts. The decedent, during all years here involved and also for an extended period thereto, maintained an office in Boston where he engaged principally in acting as a trustee and in handling various family and personal matters. His only employee was a secretary, Harriet C. Thompson. He did not maintain any books of account for his personal affairs; but he did have a checkbook out of which he alone issued checks, and he also had files which were kept under his direction by his secretary. Facts re Earlier Period, 1931-1945 In 1931 (approximately 23 years prior to the first taxable year here involved) a woman named Myra Page Wiren filed a bill of complaint in the United States District Court for the Southern District of New York against Shubert Theater Corporation, United Artists Corporation, Paramount Famous-Lasky Corporation, and certain other corporate and individual defendants. In this complaint [1] she alleged, in substance, that she had written a dramatic work and composition entitled *73 "Most," which was described as a fictitious tragedy of three acts; that the defendants had plagiarized this composition in producing and presenting on the stage and elsewhere, another play entitled "Death Takes a Holiday"; and she sought to enjoin the defendants from producing, presenting, publishing or otherwise exhibiting said last-named play, and also to obtain an accounting from them for profits realized therefrom. Myra Wiren's counsel of record in this suit was her brother, Oscar B. Wiren; and both he and Myra's sister, Frances A. Wiren, had financial interests in the proceeding although they were not named as complainants. The litigation with respect to this particular suit continued, as hereinafter shown, until the year 1945. During the period that said litigation was in progress, the decedent *74 made cash payments to the three Wirens in an unestablished total amount, for the purpose of assisting them in their financing of the litigation. He had no blood relationship to them. The first indication of these payments shown in the evidence herein, is a promissory note (hereinafter identified as "instrument A") which the decedent received in or about the year 1934, and which read as follows: $75.00 January 9, 1934 On demand after date I promise to pay to the order of Robert Treat Paine Seventy-five… xx/100 Dollars at 10 State Street, Boston, Mass. Value received No…. Due… /s/ Oscar B. Wiren Subsequently, in 1937, decedent received from the Wirens another instrument (hereinafter identified as "instrument B") which read: THIS INDENTURE, made the twenty-sixth day of September, 1937, between Myra Page Wiren, Frances A. Wiren and Oscar B. Wiren, all of New York City, and Robert Treat Paine of Boston, Massachusetts, WITNESSETH: WHEREAS the said Myra Page Wiren is the author and copyright-owner of a certain drama entitled "Most", and an action at law is now pending in the Courts of Italy to recover damages for the plagiarism of said drama by a certain play entitled "La *75 Morte In Vacanze", and to recover the profits from said play and the motion-picture made from said play, and to recover the profits from the English adaptation of said play entitled "Death Takes A Holiday" and the motion-picture made from said adaptation, in the various countries where the said play, adaptation and motion-pictures have been and are being produced, and the profits from the publication of the book of said play and other profits, and WHEREAS the said Robert Treat Paine has rendered valuable legal advice and valuable assistance in connection with said suit and has provided and advanced funds in the sum of Twenty-four thousand ($24,000.00) Dollars for the conduct of said suit, NOW THEREFORE THIS INDENTURE WITNESSETH: That the said Myra Page Wiren, Frances A. Wiren and Oscar B. Wiren, in consideration of the premises as aforesaid, and in pursuance and furtherance of a similar agreement heretofore made by the said Myra Page Wiren to said Robert Treat Paine, it is hereby agreed that the said Robert Treat Paine shall be and is entitled to receive and shall receive One Quarter of the net amount of all monies obtained by judgment, settlement or otherwise from said suit and *76 from all claims arising therefrom or from said plagiarism, all money advanced by the said Robert Treat Paine to be paid out of the gross amount obtained as aforesaid, and the said Myra Page Wiren has sold and assigned and by these presents does sell, transfer, set over and assign unto the said Robert Treat Paine One Quarter of the said net amount of all monies now due to her or which may become due to her by reason of said plagiarism or said suit or any claims arising therefrom and One Quarter of the net amount of all the right, title and interest which she has in all said monies, and the said Frances A. Wiren and Oscar B. Wiren do hereby join in said assignment to the full extent of the interest that they have or may hereafter have in the said suit or in any monies to be obtained as aforesaid, and the said Myra Page Wiren does hereby duly give the said Robert Treat Paine full power and authority in her name or in his own name to demand, collect and receive the said One Quarter of all said monies. IN WITNESS WHEREOF, we have hereunto set our hands and seals, this twenty-sixth day of September 1937. /s/ Myra Page Wiren /s/ Frances A. Wiren /s/ Oscar B. Wiren And thereafter, *77 in about 1943, decedent received from the Wirens a third instrument (hereinafter identified as "instrument C") which read: THIS INDENTURE, made the sixteenth day of October, 1943, between Myra Page Wiren, Frances A. Wiren and Oscar B. Wiren, all of New York City, and Robert Treat Paine of Boston, Massachusetts, WITNESSETH: WHEREAS the said Myra Page Wiren is the author and copyright owner of a certain drama entitled "Most," and an application is being made for the hearing of an action in the United States Court, to recover damages for the plagiarism of said drama by a certain play entitled "La Morte In Vacanze" and "Death Takes a Holiday," and to recover the profits from said play and from the motion picture made from said play and the profits from the publication of the book of said play, and WHEREAS the said Robert Treat Paine has rendered valuable legal advice and valuable assistance in connection with said suit and has provided and advanced funds for the conduct of said suit, NOW THEREFORE THIS INDENTURE WITNESSETH: That the said Myra Page Wiren, Frances A. Wiren and Oscar B. Wiren, in consideration of the premises aforesaid and in pursuance and furtherance of an agreement *78 of assignment heretofore made by the said Myra Page Wiren to said Robert Treat Paine, hereby agree that the said Robert Treat Paine is entitled to receive and shall receive, in addition to any amounts stated in any previous agreement, and to be considered and treated as an addition to said previous agreement, the additional sum of Sixty-three hundred Dollars ($6300.00) such sum having been provided and advanced in sundry amounts and at sundry times subsequent to said previous agreement, and to which additional sum the same provisions shall pertain as provided for in said previous assignment. IN WITNESS WHEREOF, we have hereunto set our hands and seals, this sixteenth day of October, 1943. /s/ Myra Page Wiren /s/ Frances Wiren /s/ Oscar B. Wiren The manner in which the above-mentioned payments were made from the decedent to the Wirens during years prior to 1945 was as follows. The decedent would from time to time personally issue a check made payable to Myra Wiren, and have his secretary mail it to one or another of the Wirens; and shortly thereafter he would receive through the mail, two instruments: One of which instruments was a promissory note which would be identical *79 to instrument A, except as to the date and the amount thereof; and the other of which would be identical to either instrument B or instrument C, except as to the date and the amount thereof. The decedent, after receiving these instruments had his secretary place them in one of his office files; and during the period from 1931 through 1945, a considerable number of such instruments was so accumulated and so filed. Due to the facts that the decedent who had personally handled the transactions had died prior to the trial herein, and that all of the above-mentioned instruments other than the three above quoted had been inadvertently destroyed in closing the decedent's office in 1956, neither the date nor the amount of any of these instruments (other than the three above quoted) has been established by the evidence; and there is no evidence as to the total amount of the payments which the decedent so made to the Wirens during the period from 1931 through 1945. The result of the above-mentioned suit which Myra Wiren commenced in 1931 in the District Court for the Southern District of New York, was as follows: In August 1933, the District Court, in an opinion by Judge Goddard, held that *80 Myra's rights in the composition entitled "Most" were not infringed by "Death Takes a Holiday," and that the complaint did not set forth facts sufficient to constitute a cause of action. Accordingly, the court granted a motion of the defendants to dismiss the bill of complaint, and entered judgment for the defendants. ( Wiren v. Shubert Theatre Corporation, 5 F. Supp. 358). In May 1934, a division of the Court of Appeals for the Second Circuit consisting of Judges Manton, Swan and Chase, affirmed per curiam (70 F. 2d 1023), the judgment of the District Court; and in October 1934, a petition for certiorari filed by the plaintiff was denied by the United States Supreme Court (293 U.S. 591). In April 1942, the plaintiff (Myra Wiren) filed a motion in the Court of Appeals for the Second Circuit, in which she requested that court to set aside its affirmance because of the alleged corruption of Judge Manton in the form of a bribe in May 1932; but this motion was denied in May 1942, by a division of the court consisting of Circuit Judges Swan, Clark and Frank. In the same year 1942, the Supreme Court denied certiorari (317 U.S. 659). *81 In June 1945, the plaintiff filed with the Court of Appeals for the Second Circuit, a second motion for a rehearing accompanied by affidavits setting forth alleged newly discovered evidence. This second motion was denied in November 1945, by a division of the court consisting of Judges Swan, Chase and Clark; and no petition for certiorari in respect of such denial was filed by the plaintiff. The foregoing proceedings finally terminated in November 1945, the suit which Myra Wiren had commenced in 1931 in the District Court for the Southern District of New York, and also all appellate action with respect thereto. No other litigation relative to infringement or plagiarism of the composition "Most" continued to be pending in any court. No claim for any loss or for any tax deduction in respect of the payments made by the decedent to the Wirens during the period of the abovementioned litigation is either claimed or involved in the instant case. Facts re Period Subsequent to 1945 On September 28, 1948 (which was nearly 3 years after the final termination of the above-mentioned litigation) Myra Wiren filed a new suit in the United States District Court for the District of Columbia. *82 The cause of action therein alleged was based on the above-mentioned bribe said to have occurred in May 1932, and discovered according to the complaint in 1937; and the relief sought was dependent upon maintenance of the action for fraud. The court ordered the suit transferred to the District Court for the Southern District of New York where the previous suit had been filed; but on plaintiff's appeal, the United States Court of Appeals for the District of Columbia Circuit vacated the order of transfer. Upon remand, the District Court for the District of Columbia then decided in a memorandum opinion by Chief Judge Laws, that the issues had previously been decided against the plaintiff in the Court of Appeals for the Second Circuit and res judicata accordingly barred the new suit; and also that the action based on fraud was barred by the statute of limitations. Thereafter in June 1953, the judgment of the trial court was affirmed by the Court of Appeals for the District of Columbia Circuit ( Wiren v. Paramount Pictures, Inc., 206 F. 2d 465); and a petition for certiorari filed by the plaintiff was denied by the Supreme Court on January 18, 1954 (346 U.S. 938). *83 The decedent, during the years 1948 through 1953, made cash payments to Myra, Frances and Oscar Wiren in a total amount of $82,541. The decedent's checkbook stubs and cancelled checks show that of said total amount, $75,625 was paid in regular weekly amounts of from $125 to $300 each; and that the remaining $6,916 of said total amount represented payments for attorneys' fees and legal expenses. The following summary shows the number of checks issued by the decedent to the Wirens during each year of said 1948-1953 period; the total amounts of said checks by years; and the portions thereof which represented payments for attorneys' fees and legal expenses: Portion of
checks rep-
No. of
Total
resenting
checks
amount
legal ex-
Year
issued
of checks
penses
1948
61
$13,275
$ 800
1949
57
17,925
2,875
1950
64
21,816
2,416
1951
56
16,475
825
1952
54
8,425
1953
37
4,625
Total
329
$82,541
$6,916
At some unidentified time during the year 1948, the decedent received from the Wirens an instrument which was identical with the above-quoted instrument B that he had received in 1937, except for the date and the amount shown *84 therein. And also thereafter from time to time during the years 1948 through 1953, the decedent received from the Wirens promissory notes and supplementary assignments which were identical with the above-quoted instruments A and C, respectively, except for the dates and the amounts therein shown. None of these instruments received during the years 1948 through 1953 was available for introduction into evidence at the trial herein, by reason of the previously stated fact that they all had been inadvertently destroyed at the time when the decedent's office was closed in December 1956. Accordingly, neither the dates nor the amounts shown in any of said instruments are determinable; and there is no evidence herein regarding the same. Frances Wiren died a resident of New York in January 1952 (approximately 2 years prior to the first taxable year here involved), after being bedridden for approximately 9 years prior to her death, which included all the years when said 1948-1953 payments were made. Myra Wiren died a resident of New York in December 1953, after being an invalid for the last 20 years of her life. And Oscar Wiren died a resident of New York subsequent to 1956 and prior to the *85 trial herein. None of the three Wirens had any assets of value at the time of death, and an investigation made by the decedent's executor indicated that they had "no such assets at any time." Also none of their estates was probated. No portion of the cash payments which the decedent made to the Wirens during the years 1948 through 1953 was ever repaid to the decedent; nor was any interest ever paid in respect to the same. The decedent, in his individual income tax return for the year 1954, claimed a nonbusiness bad debt loss of $82,576 [2] for said year, with respect to the payments made by him to the Wirens during the years 1948 through 1953. In a statement attached to this 1954 return, decedent stated in part: "Pursuant to an agreement between the Wirens and the taxpayer, the source of repayment of the loans was restricted to the proceeds of the lawsuit." And he indicated also in said statement that the "lawsuit" which he referred to, was the suit which Myra Wiren filed in the United States District Court for the District of Columbia in 1948, and the appellate proceeding with respect thereto. Ultimate Findings *86 of Fact Any repayment to the decedent of any portion of the $82,541 which he had paid to the Wirens during the period 1948 to 1953 (irrespective of the purposes for which such amount was used by the Wirens) was to be made only when, if, and to the extent that Myra Wiren realized, through judgment or settlement or otherwise, proceeds from the prosecution of the lawsuit which she filed in 1948 in the United States District Court for the District of Columbia. Myra's prosecution of said lawsuit and the appellate proceedings in respect thereof, were finally terminated, adversely to her, in 1954; she never received, through judgment or settlement or otherwise, any proceeds from her prosecution of said lawsuit; and in the absence of such proceeds, no repayments to the decedent ever became payable, and no such repayments ever were made. No debt ever was owing, or ever became payable, from the Wirens to the decedent in respect of any of the payments made by decedent during the years 1948 through 1953; and no such debt either came into existence or became worthless during the taxable year 1954. Opinion The sole issue raised by the pleadings herein, is stated in the petition as follows: *87 The determination of tax set forth in the notice of deficiency is based upon the following error, namely, the disallowance by the Commissioner of a nonbusiness bad debt in the sum of $82,541.00, incurred in the year 1954. [Italics supplied.] This statement of the issue is in accord with the position taken by the decedent in his 1954 return and in the explanatory statement attached thereto; and it is in accord also with the only basic position reflected in the proposed findings of facts and the arguments presented by petitioner in his briefs. The petitioner's contentions, on brief, are in substance: That the transactions between the decedent and the Wirens during the years 1948 through 1953, "constituted a loan" in the total amount of $82,541; that such loan or loans were evidenced by demand promissory notes which were "collaterally secured" by an assignment of an undivided interest in hoped-for proceeds, through judgment or settlement or otherwise, from the lawsuit which Myra Wiren had commenced in 1948 in the United States District Court for the District of Columbia, and which was pending during the time that the payments here involved were made. He further contends that, *88 as stated by the decedent in his 1954 tax return: "Pursuant to an agreement between the Wirens and the taxpayer, the source of repayment of the loans was restricted to the proceeds of the lawsuit"; and that by reason of said restriction and the fact that none of the Wirens had any assets, "the debt" became worthless in the taxable year 1954, when the Supreme Court denied the petition for certiorari in that suit, and the sole source from which any repayment to the decedent might otherwise have become payable, vanished. The respondent, on brief, has advanced several arguments in opposition to the petitioner's position. These include in substance: (a) That petitioner has not established that the regular weekly payments of from $125 to $300 which the decedent made to the Wirens actually constituted "loans"; (b) that the payments of the decedent to the Wirens did not create a "debtor-creditor relationship" within the meaning of section 166 of the 1954 Code, since repayment was contingent upon an event which never occurred, i.e., the successful conclusion or settlement of the lawsuit instituted by Myra Wiren in 1948; (c) that even if the amounts in question were "loans" when made, there *89 is no evidence showing that they "became worthless" during the taxable year 1954; and (d) that if the alleged debt could have been collected from the Wirens regardless of the lawsuit, there is insufficient evidence to establish that the same became worthless in 1954. We find it unnecessary to consider all the above contentions of the respondent, for our following holding as to the legal soundness of respondent's second alternative contention (contention (b) above stated) is dispositive of the case. Section 166(a)(1) of the 1954 Code provides: (a) General Rule. - (1) Wholly Worthless Debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. [Italics supplied.] And subsection (d)(1)(A) and (B) of said section further provides so far as is here material: (d) Nonbusiness Debts. - (1) General Rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) * * * shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held *90 for not more than 6 months. [Italics supplied.] Cognate provisions are included in section 23(k)(1) and (4) of the 1939 Code as amended. It therefore becomes necessary, in applying said provisions of the 1954 Code in the instant case, to determine: (a) Whether the payments which the decedent made to the Wirens during the period from 1948 through 1953, gave rise to a "debt" within the meaning of said statutory provision, and (b) if they did, whether such debt "became worthless" in the particular taxable year 1954. We have hereinbefore found as an ultimate fact from our consideration and weighing of all the evidence, and we here hold, that any repayment to the decedent of any portion of the $82,541 which he had paid to the Wirens during the period 1948 to 1953 (irrespective of the purposes for which such amount was used by the Wirens) was to be made only when, if, and to the extent that Myra Wiren realized, through judgment or settlement or otherwise, proceeds from the prosecution of the lawsuit which she filed in 1948 in the United States District Court for the District of Columbia. This finding and holding are supported in the evidence by the following provision of the abovementioned *91 instrument B which decedent received from the Wirens: [All] money advanced by the said Robert Treat Paine [is] to be paid out of the gross amount obtained as aforesaid [i.e., "by judgment, settlement or otherwise from said suit and from all claims arising therefrom or from said plagiarism"]. [Italics supplied.] and also by the provision of the supplemental agreement (instrument C) which stated that as to additional sums "advanced in sundry amounts and at sundry times subsequent to said previous agreement, * * * the same provisions shall pertain as provided for in said previous assignment." In addition, our said finding and holding are supported also by the admission made by the decedent in the statement attached to his 1954 income tax return that: "Pursuant to an agreement between the Wirens and the taxpayer, the source of repayment of the loans was restricted to the proceeds of the lawsuit." Thus it is clear that although any promissory notes which may have been received by the decedent were prepared in the form of demand notes, such formalism is not controlling ( Emanuel N. (Manny) Kolkey, 27 T.C. 37, 57-58) for it was the intention and agreement of the *92 decedent and the Wirens that repayment would be made only if and not until proceeds from the lawsuit might actually be realized by Myra Wiren; and then only out of any "gross amount [so] obtained." Also it is clear that the indenture identified as instrument B did not constitute "collateral security" for any existing "debt"; for not only does the evidence contain no mention whatever of any collateral security, but also under the terms of instrument B the amount which was to be paid to the decedent in the contingency that proceeds were realized from the lawsuit was not merely the amount of his payments but in addition one-quarter of the "net amount" remaining after all such payments (and apparently all expenses of the litigation) were satisfied out of the "gross amount" received. Such agreement is inconsistent with any principle of collateral security for the payments alone. Accordingly we hold, as above stated, that any repayment to decedent was contingent; and that no debtor-creditor relationship and no debt within the meaning of the applicable statute would arise or come into existence, unless and until Myra Wiren should at some indeterminabler future time receive proceeds from *93 her lawsuit - and such event never occurred. Both this Court and others have held that a "debt" within the meaning of the applicable statute does not arise or exist where repayment of advancements is dependent on a contingency that might never, and did not, occur. In Evans Clark 18 T.C. 780, aff'd per curiam on an alternative ground, (C.A. 2) 205 F. 2d 353, this Court dealt with a situation where the taxpayer had advanced to his wife a sum of money to purchase the stock of a corporation owning the newspaper with which she was associated; and the wife was to repay such sum only if the newspaper earned sufficient profits and she received sufficient dividends to make repayment. We said in our opinion therein: It is elementary that among the essential prerequisites for a bad debt deduction are a clear showing that the parties intended to create a debtor-creditor status and further that a debt in fact exists, * * * [Citing cases.] * * *
Even if we assume that an obligation existed, such obligation would not have constituted a debt since admittedly it was subject to a contingency that never occurred. A debt both under the principles of general law and *94 within the meaning of section 23(k) of the Internal Revenue Code does not arise where the obligation to repay is subject to a contingency and the contingency has not occurred. * * * [Citing cases.] As held in Bercaw v. Commissioner, supra, [(C.A. 4), 165 F. 2d 521] "A deduction for a bad debt under section 23(k)(1) is allowable only if the obligation to pay is certain and actually in existence. 'The term "indebtedness" as used in the Revenue Act implies an unconditional obligation to pay.'" * * *
This definition of a debt or an indebtedness has been uniformly applied in cases dealing not only with deductions under section 23(k), but also cases involving interest deductions and the meaning of borrowed invested capital as contained in section 719(a)(1). * * * [Citing cases.] To the same effect see Lucia Chase Ewing, 20 T.C. 216, aff'd. (C.A. 2) 213 F. 2d 438; Bercaw v. Commissioner, (C.A. 4) 165 F. 2d 521, affirming a Memorandum Opinion of this Court; Hattie Wolff, 26 B.T.A. 622. Likewise, in Alexander & Baldwin v. Kanne, (C.A. 9) 190 F. 2d 153, the Court *95 of Appeals had before it a situation in which the taxpayer had advanced a sum of money to a trust company (referred to as the Waterhouse Company) which was in financial difficulties and had received an instrument providing for repayment of the amount advanced with interest "only when, if and to the extent that, * * *" after all the indebtedness and liquidation costs of Waterhouse Company had been paid, there remained an excess of assets. The trust company was thereafter liquidated and no excess of assets remained. The Ninth Circuit, in holding that no bad debt loss was deductible by the taxpayer, said in part: Undoubtedly if the contingency here provided for had arisen by existence of assets in the Waterhouse Company after the liquidation of its obligation, a debtorcreditor relationship then would have existed. If thereafter the Waterhouse Company had become hopelessly insolvent and could not possibly have paid anything on the debt it would then have become "bad" within the meaning of § 23(j) [Revenue Act of 1932]. That, however, is not the instant case. Nor is it the case of an ordinary promissory note made payable on a definite date, and hence the debtor-creditor relationship *96 is certain to arise. * * * Here where there is no certainty that the debtor-creditor relationship ever will arise, the instant promise to pay money does not create a deductible debt. In this we are in accord with the view of the First Circuit in Milton Bradley Co. v. United States, 146 F. 2d 541, 542, and of the Fourth Circuit in Bercaw v. Commissioner of Internal Revenue, 165 F. 2d 521, 525. The same principles have been given recognition and been applied in a substantial number of other cases: TennesseeProducts & Chemical Corp. v. United States, (D.C. Tenn) 199 F. Supp. 885, 890, affirmed per curiam (C.A. 6) 297 F. 2d 529, certiorari denied 370 U.S. 911; Guardian Investment Corp. v. Phinney, (C.A. 5) 253 F. 2d 326, 330-331; Loewi & Co. v. Commissioner, (C.A. 7) 232 F. 2d 621, 624, affirming 23 T.C. 486; Milton Bradley Co. v. United States, (C.A. 1) 146 F. 2d 541, 542; Gilman v. Commissioner, (C.A. 8) 53 F. 2d 47, 50, affirming 18 B.T.A. 1277; Zimmerman v. United States, (D.C. Hawaii) 209 F. Supp. 312, 316. Petitioner's reliance *97 on Putnam v. Commissioner, 352 U.S. 82, and on United Gas Improvement Co. v. Commissioner, (C.A. 3) 240 F. 2d 312, is misplaced. The Putnam case involved a guarantor who paid a corporation's indebtedness to a bank in compliance with the obligation raised by law from his contract of guaranty; and who then sustained a loss because the corporate debtor was unable to reimburse him. And the United Gas case is also a guarantor case involving a complicated set of facts, in which a corporate taxpayer assumed another's guaranty of dividends on the preferred stock of its own subsidiary; and in which the taxpayer had then made payments not only under the guaranty but also in obtaining release from future liability thereunder, without being able to obtain reimbursement from its subsidiary because of the latter's insufficiency of assets. The Third Circuit, in dealing with such situation stated that, "It is true that it has been held that a loan repayable only contingently is not a debt, within the meaning of the Internal Revenue Code, for which a bad debt deduction may be taken"; but the court then expressed doubt whether such doctrine was applicable to the particular *98 situation before it. Based on all the foregoing, we hold that in the instant case no "debt" within the meaning of the applicable statute ever came into existence; and that a nonexistent debt could not become worthless. We decide the issue for the respondent. And we also approve the respondent's determinations for all the taxable years 1954 through 1958. Decision will be entered for the respondent. Footnotes
1. It was agreed at the trial herein, that this Court might examine the published reports (hereinafter cited) for all Federal court cases mentioned in the Stipulation of Facts filed herein; might observe the findings and conclusions of the courts as shown in such reports; and might refer to the same in the same manner as if they had been incorporated in the record of the instant case.↩
2. The parties have agreed that said figure should be $82,541.↩