Max D. Gustin and Mary J. Gustin v. Commissioner. Leon B. Mead and Mildred C. Mead v. Commissioner.
Gustin v. Commissioner
Docket Nos. 5949-65, 5950-65.
United States Tax Court
T.C. Memo 1968-42; 1968 Tax Ct. Memo LEXIS 255; 27 T.C.M. (CCH) 186; T.C.M. (RIA) 68042; March 14, 1968. Filed *255 John Kennedy Lynch, 907 East Ohio Bldg., Cleveland, Ohio, for the petitioners. Harvey N. Shapiro, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: In these consolidated cases respondent determined the following income tax deficiencies: Petitioners
Year
Deficiency
Max D. and Mary J. Gustin
1961
$ 858.93
1962
10,854.88
Leon B. and Mildred C. Mead
1962
18,062.07
Certain concessions have been made by the parties in Docket No. 5949-65 which can be given effect in the Rule 50 computation. Two questions are presented for decision: 1. Is the petitioner Max D. Gustin entitled to deduct as a business bad debt the amount of $2,300 owed to him by Francis J. and Mary Ann Clarke which became worthless in 1961? 2. Are the petitioners Max D. Gustin and Leon B. Mead entitled to deduct as business bad debts or losses certain amounts, advanced by them in 1961 and 1962 to Parsons Equipment Corporation, which allegedly became worthless in 1962? Findings of Fact Some of the facts are stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Max D. and Mary J. Gustin, husband and wife, were legal residents of Cleveland, Ohio, at the *256 time they filed their petition herein. Their joint Federal income tax returns for the taxable years 1961 and 1962 were filed with the district director of internal revenue at Cleveland, Ohio. Leon B. and Mildred C. Mead, husband and wife, were legal residents of Shaker Heights, Ohio, when their petition was filed herein. Their joint Federal income tax return for the taxable year 1962 was filed with the district director of internal revenue at Cleveland, Ohio. Max D. Gustin (hereinafter called Gustin) has practiced law in Cleveland since 1925. From that time until the present he has on occasion loaned money to individuals and corporations, some of whom became his clients. As reflected in his loan records, Gustin made the following loans between 1944 and 1966: Borrower
Amount of Loan
Year Loan Made
Year Payments ofPrincipal and InterestReceived
Ramus Trucking Co.
$ 1,950.00
1944
1944-1946
Stewart Allyn
1,000.00
1944
1944
Stewart Allyn
330.00
1945
1946
Ellen E. Feithemier
929.74
1947
1947-1949
Stewart Allyn
819.66
1947
1950
Warren E. Weimar
1,200.00
1949
Agnes R. & Elmer E. McClintock
2,600.00
1949
1949-1953
Gurr-Fricker
5,125.95
1951
1951-1954
Helen M. Custard
3,300.00
1961
1961-1966
Warren E. Weimar
10,000.00
1964
1964 to date
John N. Sboukis
10,500.00
1966
1966-1967
*257 On his Federal income tax returns for 1961 and 1962, the 2 years here involved, Gustin reported as part of interest income the amounts of $44 and $88 received in 1961 and 1962 from Albert F. and Helen M. Custard. The Family Finance Corporation, which is engaged in the small loan business in Cleveland, occasionally referred borrowers to Gustin when the amount to be borrowed exceeded the statutory limit for small loan companies. Gustin was an officer and stockholder in the Family Finance Corporation, and Mary J. Gustin, his wife, was its vice president. 188 Marie Weimar, Gustin's secretary from 1941 to 1956, spent about 2 hours a week working on his loan records. Frances Sidnell, his secretary from 1956 to 1962, spent about 3 days each month working on the loan records. On October 10, 1958, Gustin loaned $2,875 to Francis J. and Mary Ann Clarke; Francis J. Clarke, who worked for the Cleveland Police Department, was in financial difficulty. The Clarkes were referred to Gustin by Warren R. Weimar, general manager of the Family Finance Corporation. Gustin received a note for $3,600 covering the loan and unpaid attorney's fees. On August 30, 1961, the balance due on the loan was $2,300. *258 This amount has never been paid. On August 30, 1961, Francis J. Clarke was adjudged a bankrupt. No legal services were performed for the Clarkes after the loan was made. Leon B. Mead (hereinafter called Mead) has been in the business of selling insurance for 50 years. For about 30 years he has on occasions loaned money to individuals and corporations to assist them in buying insurance and making premium payments. Mead received interest on the loans. In some instances he was able to preserve his insurance commissions by making the loans. Between 1950 and 1967 he made the following loans: 1. A loan to Charles L. Greene of $2,500 in 1950. 2. A loan to Newman Wrecking and Salvage Company of $1,845.17 in 1950. 3. A loan to Marion Oil Company of $2,300 in 1950. 4. A loan to George Haddad of $3,000 in 1960. 5. A loan to Marion Oil Company of $5,000 in 1960. 6. Loans to Leo's Super Gas Station, totaling approximately $13,000, made between 1957 and 1967. Parsons Equipment Corporation was organized prior to 1961 by Gustin, Mead, and E. B. Parsons, with each owning one-third of the stock. The initial paid-in capital was $20,400. The corporation was engaged in equipment sales, manufacturing, *259 and engineering work. In October 1961, Parsons Equipment Corporation undertook certain contracts for the United States Army Transportation Material Command, St. Louis, Missouri, the Corps of Engineers, Chicago, Illinois, and the Portsmouth Naval Shipyard, Portsmouth, New Hampshire. These contracts related primarily to the construction of parts for the atomic Polaris submarine. The parts consisted of diving planes, rudders, and foundations of atomic propulsion plants. The contracts provided for fixed prices totaling $128,000. The corporation required additional funds to perform the work required by the contracts. In 1961 and until January 1962, money was made available to Parsons Equipment Corporation by the Society National Bank in the form of 90-day loans. Harry Hoffman, vice president of the bank, approved the loans. The highest balance of these loans was in the range of $92,500 to $93,500 and was reached in January 1962. The money advanced to the corporation by Society National Bank would not have been provided but for the fact that Gustin and Mead cosigned all the notes and were personally liable thereon. This was done because the corporation had no net worth, and Hoffman thought *260 it would be unable to repay the loans. In January 1962, the bank refused to lend any more money to the corporation. A financial statement dated December 31, 1961, which was made available to Society National Bank indicated that * Parsons Equipment Corporation was under capitalized, had a deficit net worth of $14,922, and was insolvent. At that time it could not obtain from outside sources the additional financing needed to continue its operations. It was then encountering difficulty in completing its Government contracts. The corporation expected to incur costs in excess of those initially anticipated. Also at that time the Navy Department was pressing hard for delivery on the contracts, and Gustin, as an officer of the corporation, was advised that the consequences of defaulting on the contract would be severe. On January 2, 1962, Gustin and Mead entered into a memorandum of agreement which provided, in pertinent part, as follows: WHEREAS, Parsons Equipment Corporation has a number of government contracts, a schedule of which is as follows: Contractor
Gross Value
Dis- count
Corps of Engineers
$ 6,083.00
$ 30.42
U.S. Army Transportation
21,395.00
213.95
Portsmouth Naval Shipyard
44,800.00
224.00
Portsmouth Naval Shipyard
21,690.00
108.45
Portsmouth Naval Shipyard
32,980.00
164.90
*261 and has and/or expects to bid on several civilian contacts and some additional government contracts during the year 1962, and WHEREAS, said Parsons Equipment Corporation is unable to finance said 189 contracts without the aid and assistance of said Leon B. Mead and Max D. Gustin, and WHEREAS, said Leon B. Mead and Max D. Gustin each, own one-third (1/3) only of the common shares of said Parsons Equipment Corporation, and neither are willing to contribute further to the capital of said corporation or to advance it any additional funds without satisfactory assurance of timely repayment thereof, and WHEREAS, the further work on said government contracts is in jeopardy and said corporation may not be permitted to complete said contracts nor be awarded any future contracts except for the personal reputation, financial and credit soundness and standing of said Leon B. Mead and Max D. Gustin, and unless said individuals can and do agree to underwrite the financing of said contracts, and WHEREAS, it appears that the completion of said work in progress and in prospect should enable said corporation to pay its expenses and obligations, including the money heretofore and to be advanced by the *262 said Leon B. Mead and Max D. Gustin with interest, plus a salary or bonus to each of them of not less than $1,000.00 per month, and to show a profit thereon. NOW, THEREFORE, in consideration of the foregoing and the prospects of mutual profits to them, it is mutually agreed by and between the said Leon B. Mead and Max D. Gustin that they will jointly and/or severally secure to the account of said Parsons Equipment Corporation during the year 1962, the necessary moneys, credits or other finances required to complete the aforesaid government contracts, and such other orders or contracts as said Parsons Equipment Corporation may receive and which may be approved by them jointly and/or severally; that they will jointly and/or severally accept cognovit notes of said corporation bearing eight per cent interest for the amounts so advanced on said corporation's account from time to time; that said notes with interest shall be repaid to them jointly and/or severally from time to time as the aforesaid jobs may be completed and paid for, it being understood that all said government jobs now in being will be completed and paid for during 1962, and that this shall be considered as a joint enterprise *263 between and among the said Leon B. Mead and Max D. Gustin; that each of said parties does further agree to share equally all profits, including said proposed salaries or bonuses and interest, and/ or losses, resulting from this joint enterprise; and further to save each other harmless in the event of any losses as a result of this enterprise, to the extent of fifty per cent of the whole loss represented by moneys or credits actually advanced by them jointly or severally, but not including loss of anticipated salaries, bonuses or interest accumulated in the event any one or more thereof shall not materialize. On September 1, 1961, Gustin and Mead jointly furnished Parsons Equipment Corporation with $10,000. From January 18, 1962, to November 1, 1962, they jointly made advances to the corporation totaling $132,613.13. The corporation required such funds so that it could complete the Government contracts for the construction of parts for the atomic Polaris submarine. Gustin and Mead jointly received $41,100 from the corporation from January 18, 1962, to June 21, 1962. Parsons Equipment Corporation had difficulty with the Navy contracts from the very beginning because of the changes in *264 specifications, the failure of the Navy to deliver materials and the increased costs resulting from changes and delays. In February 1962, representatives of the corporation presented a schedule of anticipated excess costs to the contracting officer at the Portsmouth Naval Shipyard, but the corporate officials were advised by the Navy that it was the responsibility of the corporation to absorb such excess costs. Gustin continued to request additional funds from the Navy. Finally, on July 3, 1962, Parsons Equipment Corporation agreed to a settlement of their claim of $208,164.05 for additional costs relating to the contracts. It accepted $132,955 as final consideration on the contracts and in settlement of its claim. Parsons Equipment Corporation defaulted on the repayment of the advances obtained from Gustin and Mead in the year 1962. The advances were covered by cognovit notes. Gustin and Mead, as stockholders and officers of the corporation, knew that Parsons Equipment Corporation was insolvent in 1962 and would be unable to repay the advances made by them. The balance sheet on the corporation's Federal income tax return for the fiscal year ended August 31, 1962, reflected total assets *265 of $23,384.24 and total liabilities of $120,215.95. * Of these liabilities, approximately $85,815.63 represented the amounts advanced to the corporation by Gustin and Mead. The balance sheet on the Federal corporation income tax return for the fiscal year ended August 31, 1963, shows a decrease in total assets to $19,053.40 and an increase in total liabilities 190 to $163,413.43. During the month of September, 1963, Parsons Equipment Corporation had gross sales of $2,170.38 and a net loss from operation of $3,869.79. **
On or about April 10, 1963, Gustin and Mead filed with the district director of internal revenue at Cleveland a U. S. Partnership Return of Income (form 1065) for the year 1962 showing a net loss of $101,513.13. A schedule attached to the return shows income and disbursements, as follows: INCOME - REIMBURSED ON GOVERNMENT CONTRACTS
January 18, 1962
$ 15,000.00
February 8, 1962
7,500.00
April 30, 1962
10,240.62
May 11, 1962
2,500.00
June 21, 1962 5,859.38
TOTAL INCOME
$ 41,100.00
@DISBURSEMENTS - ADVANCED FOR GOVERNMENT CONTRACTS
September 1, 1961
$ 10,000.00
January 18, 1962
15,000.00
January 23, 1962
5,000.00
January 30, 1962
15,000.00
February 8, 1962
7,500.00
March 9, 1962
5,000.00
March 11, 1962
2,300.00
March 16, 1962
5,000.00
March 22, 1962
20,756.25
March 23, 1962
4,000.00
April 2, 1962
3,000.00
April 5, 1962
1,500.00
April 27, 1962
2,000.00
April 30, 1962
20,000.00
May 11, 1962
2,500.00
June 21, 1962
5,859.38
August 1, 1962
5,000.00
September 6, 1962
5,000.00
October 8, 1962
6,100.00
November 1, 1962 2,097.50
TOTAL DISBURSE- MENTS
$142,613.13
In *266 November 1964, Gustin and Mead filed separate actions in the Cuyahoga County Common Pleas Court against Parsons Equipment Corporation for the recovery of $35,000 and $65,000, respectively, on the cognovit notes. Judgments were rendered in their favor and have never been satisfied. The judgments obtained by Gustin and Mead represented the losses claimed on their 1962 partnership and individual income tax returns. In 1964, Gustin and Mead reported their stock in the corporation as having become worthless. Parsons Equipment Corporation continued to engage in some operations at least through September, *** 1963. It surrendered its corporate charter on March 15, 1965, and is presently nonexistent. In 1961 and 1962 Mead placed the insurance for Parsons Equipment Corporation, and Gustin performed some legal and other services for the corporation in his capacity as its secretary-treasurer. In the notices of deficiencies sent to Gustin and Mead the respondent disallowed the claimed losses with the following explanation: It is determined that the loss of $50,756.56 which you claimed on your income tax return *267 for the taxable year ended December 31, 1962 as a partnership loss and resulting from advances to Parsons Equipment Corporation is not allowable as you have not established your right to such deduction. Opinion Issue 1 - Loan to the Clarkes It is clear from the evidence that Gustin suffered a bad debt loss of $2,300 in the year 1961 on the loan he made to Francis J. and Mary Ann Clarke in 1958. Thus the focal point of the dispute between the parties on this issue is whether the claimed deduction should be allowed as a business bad debt or as a nonbusiness bad debt. [1] *268 In contending that he is entitled to a business bad debt deduction, Gustin takes a two-pronged approach: (1) That before, during and after the year 1958 he was in the separate business of lending money, and (2) that the loan he made to the Clarkes was proximately related to his business as an attorney. Respondent takes the opposite view on both points. We agree with the respondent. Whether Gustin was engaged in a trade or business of lending money is essentially a question of fact. This record does not 191 support a finding that Gustin was ever in the business of lending money, particularly during the period from 1958 through 1962. His loan activities were too few and too infrequent to constitute a separate business. Since 1925 he has been actively engaged in the practice of law. Most of his income ($29,060.63 in 1961 and $37,947.40 in 1962) was derived from his law practice. His 1961 and 1962 income tax returns show only small amounts of interest derived from loans. Except for the loan to the Clarkes, there is no evidence of any other loans made in 1958. There is evidence of two loans made in 1961, the year in which *269 the Clarke debt became worthless. As our findings of fact indicate, there were 11 loans made by Gustin over the 22-year period from 1944 to 1966. The so-called "loan records" kept by Gustin's secretaries were a part of and interspersed through the general ledgers relating to his law business. In addition, there is a paucity of evidence that Gustin ever held himself out to the public as a lender of money. And there is no evidence, even from Gustin's rather general, and sometimes vague, testimony, to establish the amount of time and effort he expended in connection with his alleged lending business. Courts have consistently held that the right to take a deduction for a business bad debt is applicable only to exceptional situations where the taxpayer's activities in making loans have been regarded as so extensive and continuous as to elevate them to the status of a separate business. See, e.g., Max M. Barish, 31 T.C. 1280, 1286 (1959); H. Beale Rollins, 32 T.C. 604, 613 (1959), affd. 276 F. 2d 368 (C.A. 4, 1960); Ferguson v. Commissioner, 253 F. 2d 403, 406 (C.A. 4, 1958), affirming 28 T.C. 432 (1957); Stuart M. Sales, 37 T.C. 576, 580 (1961); and United States v. Henderson, 375 F. 2d 36 *270 (C.A. 5, 1967). Certainly the facts here are nothing like those which were present in Hyman R. Minkoff, T.C. Memo 1956-269 (a case heavily relied on by the petitioner Gustin), where the taxpayer made 40 loans, totaling $300,000 over a 5-year period, many of which were secured by mortgages and deeds of trust. Equally weak and unconvincing is the argument that the Clarke debt was proximately related to Gustin's business as an attorney. While the record is not entirely clear, it appears that the Clarkes became clients of Gustin at the time they were referred to him by Weimar and the loan was made to them for the purpose of paying off their creditors. But there is no evidence that Gustin loaned them money to retain them as clients or that he ever obtained any subsequent legal business from them or from any other persons referred to him by the Clarkes. The linchpin of petitioner's position is missing. He has failed to establish the necessary proximate relationship between making the loans and practicing law. His general statement that he has "always made loans in the course of my business and to many people" as "one way of building up my practice" is insufficient to carry his burden of *271 proof when viewed in the context of the few loans actually made. Cf. Robert H. McNeill, 27 T.C. 899 (1957), affirmed on this issue 251 F. 2d 863 (C.A. 4, 1958); Estate of Dominick F. Pachella, 37 T.C. 347, 352 (1961) affirmed per curiam 310 F. 2d 815 (C.A. 3, 1962); Rollins v. Commissioner, supra; and United States v. Henderson, supra.The facts here are clearly distinguishable from those in J. T. Dorminey, 26 T.C. 940 (1956); Main v. United States, an unreported case (W.D. Wash., 1966),; and Frank A. Garlove, T.C. Memo 1965-201, relied upon by petitioner. We hold that the loan to the Clarkes was not related to any trade or business of Gustin and that its worthlessness in 1961 must be treated as a nonbusiness bad debt. Issue 2 - Advances to Parsons Equipment Corporation On this issue the petitioners Gustin and Mead make the following contentions in their brief: I. The two taxpayers having been in the business of individually lending money for many years, organized a partnership for the purpose of lending money to Parsons Equipment Corporation; therefore, the losses suffered in 1962 by the partnership from defaults by Parsons Equipment Corporation were deductible as business losses *272 of the partnership. II. The lending of money by Mr. Gustin and Mr. Mead was a related activity to their other business enterprises - as to Mead lending to clients or potential clients was helpful to his insurance business and as to Gustin lending money to clients or potential clients provided him a source 192 of business in his law practice - therefore, the losses suffered by the Gustin-Mead partnership due to defaults by Parsons Equipment Corporation in 1962 were deductible as business losses. III. Loans by the Gustin-Mead partnership to the Parsons Equipment Corporation were necessary to provide salaries or bonuses to the individuals Gustin and Mead and thus had a business purpose qualifying the losses as business bad debts or losses. Respondent counters by arguing (1) that the advances were placed by Gustin and Mead at the risk of the business and any capital loss would be deductible in 1964 when the petitioners deducted their losses on their stock in Parsons Equipment Corporation and (2) that, even if bona fide debts were created, they were nonbusiness debts which did not become worthless in 1962. Whether the advances to Parsons Equipment Corporation represented genuine loans *273 rather than risk capital is open to serious question. Despite the form (cognovit notes) in which the advances were cast and the rather self-serving statement, contained in the memorandum of agreement dated January 2, 1962, that the petitioners were unwilling to make additional capital contributions to their controlled corporation, we are nevertheless inclined to agree with respondent that in substance the sums advanced were capital contributions. The corporation was definitely undercapitalized, with only $20,400 of paid-in capital, and its need for substantial advances was largely attributable to this severe lack of working capital. The petitioners never received any interest on the advances. Nor does it appear that they actually received any funds from the corporation as a return of their advances because on each date that the "partnership return" shows "Income - Reimbursements on Government Contracts" there is either an equal or greater amount shown under "Disbursements - Advanced for Government Contracts." In addition, it is quite apparent from the financial statements of the corporation that other creditors were paid in the years 1962 to 1964 and that any obligations owed to petitioners *274 were subordinated to the claims of other creditors. It seems highly persuasive that the expectation of repayment was based only upon possible future earnings. The petitioners were satisfied to let their money ride with the ups and downs of the venture, hoping that the business might eventually become profitable and that they would someday reap the fruits of successful investments. In early 1962 Gustin spoke with Naval authorities concerning the price terms of the contracts, and representatives of the corporation wrote to Portsmouth Naval Shipyard regarding their increased costs and requested additional compensation. The Navy did not favorably receive these requests. In fact, no written modification of the price terms of the contracts was obtained until July 7, 1962. In a letter dated April 19, 1962, and signed by Gustin as secretary-treasurer of Parsons Equipment Corporation, he stated that "The excess costs were presented to you in February and we were told that it was our responsibility to absorb these costs." In view of these circumstances it seems that any expectation the petitioners had of repayment of their advances to the corporation depended upon the tenuous assumption that *275 the Portsmouth Naval Shipyard would modify the terms of the written contracts to allow substantial recovery of the corporation's expenses, even though the corporation had fixed price contracts and the representatives had been told that it was their responsibility to absorb such costs. As it finally turned out, Parsons Equipment Corporation received $132,955 for additional costs relating to these contracts, and the petitioners suffered a loss. Even if the corporation had been paid the full $208,164.05 it sought, Gustin and Mead would still have lost about $25,000. The advances could hardly have been made with a reasonable expectation of repayment apart from the gamble that the Navy Department would recant from its position and from the written contracts. Consequently, these circumstances strongly indicate that the advances were intended as risk capital rather than loans. See and compare Moughon v. Commissioner, 329 F. 2d 399 (C.A. 6, 1964) affirming a Memorandum Opinion of this Court; United States v. Henderson, supra at p. 40; Fellinger v. United States, 363 F. 2d 826 (C.A. 6, 1966); Wilfred J. Funk, 35 T.C. 42, 50 (1960); and Rudolf A. Zivnuska, 33 T.C. 226, 235 (1959). In any event, *276 we think the corporation would have needed funds to continue operating even if a more favorable settlement had been reached with the Navy. The agreement signed by Gustin and Mead on January 2, 1962, indicates that the funds were to be used for future contracts. Since 193 there was at that time a net deficit in the capital account, we view the advances as merely transfusions of capital. Accordingly, we conclude that the loss on the advances is deductible as a capital loss in the year in which * the petitioners' stock became worthless. However, we need not rest our decision solely on the conclusion that the advances reflected risk capital because, even if debts were created, we are satisfied that they constituted nonbusiness rather than business debts. [2] *277 We will discuss petitioners' arguments in the order in which they are made. Their first contention can be disposed of summarily. We think no partnership was formed by Gustin *278 and Mead for the purpose of actively carrying on a business. See section 761, Internal Revenue Code of 1954, and section 1.761-1, Income Tax Regs.; Commissioner v. Tower, 327 U.S. 280 (1946); Commissioner v. Culbertson, 337 U.S. 733 (1949); and Ben Perlmutter, 44 T.C. 382, 406-408 (1965), aff'd, 373 F. 2d 45 (C.A. 10, 1967). These petitioners simply agreed to advance money to Parsons Equipment Corporation, using the "partnership" as a conduit, so that they could protect their investments in the corporation. Cf. Whipple v. Commissioner, 373 U.S. 193 (1963). Even if a partnership was, in fact, created, it still did not actively conduct a trade or business of lending money within the provisions of section 166. Stuart M. Sales, supra at pp. 579-580. As we have previously pointed out, Gustin was not in the business of lending money. The evidence offered in an attempt to establish that Mead was in the business of lending money is even weaker. It consists of Mead's general, self-serving testimony and a few check stubs and cancelled checks relating to six loans made by him from 1950 to 1960. He kept no regular books or records with respect to loan activities and he did not report interest *279 on the loans on his income tax returns. He presented insufficient evidence to establish the existence of a separate lending business. See United States v. Henderson, supra at p. 41. We likewise find untenable the contention that the "loans" were related to their respective businesses of attorney and insurance agent. To qualify as a business bad debt, a debt must bear a proximate relationship to a trade or business. Whipple v. Commissioner, supra at p. 201. We believe it is inconceivable that the petitioners would risk about $70,000 each so that they could obtain the relatively small amounts of attorney's fees and insurance premiums which could have been expected from Parsons Equipment Corporation. Moreover, any business obtained from the corporation by Gustin and Mead was a very small portion of their income derived from attorney's fees and insurance premiums. It may be that some collateral business at times flows from the contacts one makes from transactions in which he has some financial interest, but this is a far cry from saying that the loss from such an investment should be considered as one "incurred in the taxpayer's trade or business." Here there is even an absence of direct *280 testimony that the purpose of the advances to the corporation was to obtain business from it. Finally, we reject the argument that the alleged loans were necessary to provide salaries or bonuses to Gustin and Mead. This assertion is not supported by the record. There is no evidence that salaries were received by Gustin and Mead at any time from Parsons Equipment Corporation. The Federal corporation income tax returns from Parsons Equipment Corporation show no compensation paid to officers in the fiscal 194 years ended August 31, 1962, and August 31, 1963. Gustin received most of his income from his law practice, while Mead received most of his income from his insurance business, dividends and interest on investments. Although the memorandum of agreement dated January 2, 1962, states that a salary or bonus of $1,000 per month was to be provided to each of them, there was no reasonable expectation of receiving it. And, in fact, they never received it. Gustin and Mead were controlling stockholders with substantial investments in the corporation as compared to any salary they might have received. The proof here falls short of showing that the alleged loans were proximately related to petitioners' *281 business of being employees of the corporation under either of the standards mentioned by the Court of Appeals in Weddle v. Commissioner, 325 F. 2d 849 (C.A. 2, 1963), affirming 39 T.C. 493 (1962). What the proof does show is that the "loans" were made to protect their investments, and only indirectly to save their rights to receive salaries or bonuses through the saving of their investments. To be sharply distinguished are the two cases on which the petitioners rely, namely, Philip W. Fitzpatrick, T.C. Memo. 1967-1; and Trent v. Commissioner, 291 F. 2d 669 (C.A. 2, 1961), reversing 34 T.C. 910 (1960). In both of these cases the taxpayers derived their livelihoods from employment by the corporations. In addition, the loans in Trent were made by a minority stockholder to a corporation to retain his job. The stockholder as a condition precedent to employment purchased one-third of the capital stock and agreed to make loans from time to time to the corporation as it was getting established. He made some advances and was discharged when he refused to make others. The Court of Appeals held under such circumstances that the employee was engaged in the trade or business of rendering services *282 to the corporation and that it was a trade or business, within the meaning of the statute, separate and apart from that of the corporation. By contrast, it cannot be said on the facts of this case that the advances were proximately related to the business of rendering services for pay by either Gustin or Mead. See Whipple v. Commissioner, supra at p. 204. Accordingly, if the advances were loans, we hold that they were deductible as nonbusiness bad debts which, on this record, did not become wholly * worthless in 1962. Unquestionably, Parsons Equipment Corporation was insolvent during and after 1962, but petitioners have failed to show any event which established, or any basis for determining, that legal action at that time to enforce payment would not have resulted in at least partial satisfaction of execution on a judgment. ** *283 See section 1.66-2(b), Income Tax Regs.
To reflect the agreement of the parties on some issues and the conclusions reached herein with respect to the issues in controversy. Decisions will be entered under Rule 50. Footnotes
*. By official order of Tax Court dated 5/2/68, the italicized words were added.↩
*. By official order of Tax Court dated 5/2/68, "$120,215.95" substituted for "$117,231.71." ↩
**. By official order of Tax Court dated 5/2/68, the preceding italicized words were substituted for "increased insolvency, i.e., total assets of $19,953.40 and total liabilities of $164,760.03. An accountant's report as of September 30, 1963 shows a condition of absolute insolvency."↩
***. By official order of Tax Court dated 5/2/68, "September" substituted for "August 31."↩
1. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly Worthless Debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * * (d) Nonbusiness Debts. - (1) General Rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness Debt Defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - *. By official order of Tax Court, dated 5/2/68, "the year in which" was substituted for "1964 when."↩
2. Section 1.166-5(b), Income Tax Regs., provides, in part, as follows: (b) Nonbusiness debt defined. For purposes of section 166 and this section, a nonbusiness debt is any debt other than - (1) A debt which is created, or acquired, in the course of a trade or business of the taxpayer, determined without regard to the relationship of the debt to a trade or business of the taxpayer at the time when the debt becomes worthless; or (2) A debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. The question whether a debt is a nonbusiness debt is a question of fact in each particular case. The determination of whether the loss on a debt's becoming worthless has been incurred in a trade or business of the taxpayer shall, for this purpose, be made in substantially the same manner for determining whether a loss has been incurred in a trade or business for purposes of section 165(c). (1) For purposes of subparagraph (2) of this paragraph, the character of the debt is to be determined by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt comes within the exception provided by that subparagraph.↩
*. By official order of Tax Court, dated 5/2/68, "wholly" inserted. ↩
**. By official order of Tax Court, dated 5/2/68, the preceding italicized words were substituted for "Parsons Equipment Corporation continued some operations at least through the fiscal year ended August 31, 1963, and apparently into the calendar year 1964. In addition, the petitioners took judgments on their cognovit notes in 1964, and they deducted losses in 1964 for the worthlessness of their stock in the corporation."