**UNITED STATES of America,**
**Appellant,**

**v.**

**Simon W. HENDERSON, Jr., Independent Executor for the Estate of Louise R. Henderson, Deceased, Appellee.**

**No. 22152.**

United States Court of Appeals
Fifth Circuit.

March 23, 1967.

Rehearing Denied June 13, 1967.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Atty., William W. Justice, U. S. Atty., Tyler, Tex., Harry Baum, Solomon Warhaftig, Attys., Dept. of Justice, Richard M. Roberts, Acting Asst. Atty. Gen., Washington, D. C., for appellant, Richard B. Hardee, Asst. U. S. Atty., of counsel.

Wright Matthews, Robert K. Sands, Dallas, Tex., for appellee.

Before JONES and COLEMAN, Circuit Judges, and JOHNSON, District Judge.

JOHNSON, District Judge:

This is an appeal by the United States from an adverse judgment in an action brought against it by Louise R. Henderson[1] for refund of income taxes and interest in the amount of $300,144.99 for the taxable years 1953 through 1959.

Sometime in 1953, Simon Henderson, Jr., who exercised a power of attorney for taxpayer during the period in question, decided to help taxpayer's grandson-in-law (and Henderson's son-in-law), Malcolm Alexander, get started in business in Lufkin, Texas. With the idea there was a demand in Texas for top grade gray iron castings, it was decided to invest in a local foundry which, with new equipment, was capable of producing this particular type of casting. A new corporation, MacKay Foundry, Inc., was formed for this purpose, with its $30,000.00 of common stock issued in the amount of $7,000.00 to Alexander, $1,-

000.00 to Henderson, $7,000.00 to taxpayer, and the remainder in varying amounts to three other individuals. The participants in MacKay understood that the additional financing for new equipment that MacKay required would come from Henderson and taxpayer.

Between April 14, 1953, and July 14, 1953, MacKay obtained four loans from the Lufkin National Bank totaling $60,000.00, at four percent interest, evidenced by four notes, each of which was endorsed by Henderson under his power of attorney from taxpayer. Although MacKay was operating at a loss, Henderson, again on behalf of taxpayer, made two advances to MacKay in the total amount of $55,000.00, at four percent interest in July, 1953. There was no security for the advances since Henderson seemed to think that MacKay would prosper, and it was generally understood that taxpayer would not be paid back until MacKay showed a profit. During the remainder of 1953, taxpayer made additional advances of $24,100.00.

MacKay continued to lose money. Reynolds, production manager, was forced to resign, and his one-third interest was bought by taxpayer for $7,500.00. Still the corporation continued to lose money, and had losses of $45,000.00 in 1954, $92,000.00 in 1955, and $125,000.00 in 1956. Yet taxpayer continued to advance MacKay money: $94,000.00 in 1954, $137,000.00 (which included a $62,000.00 advance that MacKay used to repay its indebtedness to the Lufkin National Bank) in 1955, and $145,000.00 in 1956.

In 1957, MacKay ceased operating. All of its creditors received payment in full with the exception of taxpayer.

Subsequent to the cessation of MacKay's operations, MacKay was merged with Indiana Foundry Corporation. The "notes" which MacKay had issued to taxpayer were endorsed in blank and delivered to one of the attorneys negotiating the merger with Indiana Foundry.

---

1. Louise R. Henderson died prior to trial, and Simon W. Henderson, Jr., her independent executor, was substituted as plaintiff and is appellee herein.

Thereafter, Indiana Foundry issued its stock for that of MacKay. In 1961, Indiana Foundry redeemed this stock, thereby terminating the interest of taxpayer in the two merged companies. Although the other stockholders turned over the proceeds of the redemption to taxpayer, Alexander and Henderson kept theirs, which resulted in a 100 percent gain over what they had paid for this stock.

On her federal income tax return for 1957, the taxpayer deducted in full from ordinary income the $455,000.00 that she had advanced to MacKay during the years 1953 to 1956. The net operating loss that resulted from this deduction was carried back to the years 1955 and 1956 and forward to the year 1958, and was deducted from her income for those years. The Commissioner of Internal Revenue disallowed this deduction on the grounds that the advances to MacKay constituted capital investments in its business rather than indebtedness, so that the loss resulting from their worthlessness was deductible only as a capital loss under Section 165(g), 26 U.S.C., Internal Revenue Code of 1954,[2] and that even if the advances constituted indebtedness under Section 166(d),[3] the loss resulting from their worthlessness was still deductible only as a capital loss because they were nonbusiness bad debts.

The District Court reversed, holding that taxpayer's advances to MacKay constituted indebtedness, that during the years 1953 through 1956 taxpayer was engaged in the business of lending money, and that the advances to MacKay were made in pursuance of this business of lending money.

We reverse the District Court.

**I**

■■ Although there is a plethora of precedent on the question of whether advances by a stockholder to a closely held corporation are to be considered as debts or contributions to capital, no single principle or test is controlling or decisive in making this determination. See, for example, Montclair, Inc. v. Commissioner of Internal Revenue, 318 F.2d 38, 40 (5th Cir. 1963). Perhaps the most important underlying principle is that no valid debt exists unless there is an unconditional obligation of another to pay the taxpayer a definite sum of money, and, in the context of the present case, that the taxpayer insists, together with the other creditors, on sharing in the as-

---

2. Section 165(g) provides:
"(g) *Worthless Securities.—*
(1) *General rule.—*If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset.
(2) *Security defined.—*For purposes of this subsection, the term "security" means—
(A) a share of stock in a corporation;"

3. Section 166 provides:
"BAD DEBTS.
(a) *General Rule.—*
(1) *Wholly worthless debts.—*There shall be allowed as a deduction any debt which becomes worthless within the taxable year.
(2) *Partially worthless debts.—*When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.
\* \* \* \* \*
(d) *Nonbusiness debts.—*
(1) *General rule.—*In the case of a taxpayer other than a corporation—
(A) subsections (a) and (c) shall not apply to any nonbusiness debt; and
(B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.
(2) *Nonbusiness bad debts defined.—*For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than—
(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or
(B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

sets of the corporation for repayment at any time when the corporation may be liquidated. See Mertens, Law of Federal Income Taxation, § 30.03. Thus, evidence which courts have found to be indicative of a contribution to capital rather than a cash advance includes: that the cash advances were made to commence the corporate life, that repayment was subordinated to other indebtedness, that a fixed maturity date was absent, that the corporation was inadequately capitalized, that the parties agreed not to enforce collection, that interest was to be paid out of earnings only, and that those making the advances had voting power in the corporation. See Sun Properties, Inc. v. United States, 220 F.2d 171, 175–176 (5th Cir. 1955); Aqualane Shores, Inc. v. Commissioner of Internal Revenue, 269 F.2d 116 (5th Cir. 1959); Montclair, Inc. v. Commissioner of Internal Revenue, supra; United States v. Synder Bros. Co., 367 F.2d 980 (5th Cir., July 26, 1966).

In the present case, appellee stresses that there was a clear intention on the part of the corporation to repay these notes, that MacKay was unconditionally bound to pay definite sums at fixed dates regardless of earnings, and that taxpayer was not interested in sharing the profits of the corporation beyond interest on the notes. In particular, taxpayer points to the form of the notes and the manner in which these transactions were handled by taxpayer and MacKay on their respective books as evincing indebtedness rather than contributions to capital.

■ Although the nomenclature and intent of the parties are important factors to take into account, it is clear that the nomenclature used and the intent of the taxpayer cannot alone control the tax consequences of a particular series of transactions. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935); United States v. Synder Bros. Co., supra. Moreover, we conclude that the facts and circumstances in this case belie any genuine intent to repay these sums at the dates fixed in the notes. The facts, which are in large part undisputed,

simply do not support the findings and conclusions made by the trial court that the taxpayer satisfied her burden of proof.

First, during the years 1953 through 1956, the taxpayer made advances to MacKay even though MacKay continued to lose money and had failed to improve its competitive position in the iron casting market. While the majority of the "notes" evincing the advances became due during these years no part of the "interest" or "principal" was ever paid. In fact, it was generally understood that repayment was contingent upon the success of the business and that repayment was to be made only out of profits.

Second, taxpayer's advances were also subordinated to MacKay's indebtedness to its other creditors. While MacKay's obligations to the taxpayer were past due and unpaid, MacKay continued to pay all of its obligations to its creditors. When MacKay finally ceased operations, all of its creditors were paid in full, yet no such payments were ever made on the notes held by taxpayer.

■ Finally, although this Circuit has rejected the notion that thin capitalization will alone justify the commissioner in designating indebtedness as capital, Rowan v. United States, 219 F.2d 51 (5th Cir. 1955), it is very strong evidence in a case such as this where (1) the debt to equity ratio was high to start with, (2) the parties understood that it would likely go higher, and (3) substantial portions of these funds were used for the purchase of capital assets and for meeting expenses needed to commence operations.

■ The sum total of these several factors makes the conclusion inescapable that these transactions resulted in a contribution to the capital of MacKay and did not create any genuine indebtedness within the meaning and scope of the relevant provisions of the Internal Revenue Code.

II

■ Even if we assume for purposes of argument that these transactions

created a bona fide indebtedness, the evidence overwhelmingly reflects that taxpayer was not engaged in the trade or business of lending money within the meaning of Section 166, Internal Revenue Code, and thus taxpayer is not entitled to a bad debt deduction.

The guideposts for determining what constitutes a trade or business under Section 166(d) (2) are nearly as amphorous as those involved in distinguishing indebtedness from equity investments under Section 165(g) and again no single test or factor is determinative. In general, the activities constituting the trade or business must occupy a substantial amount of the taxpayer's time or of the time of taxpayer's employees, see Snell v. Commissioner of Internal Revenue, 97 F.2d 891 (5th Cir. 1938), and these activities must be direct compensation for the taxpayer's activities or those of his employees. See Higgins v. Commissioner of Internal Revenue, 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed. 783 (1941); Whipple v. Commissioner of Internal Revenue, 373 U.S. 193, 83 S.Ct. 1168, 10 L.Ed.2d 288 (1963). Thus, in *Whipple,* holding that a taxpayer who performed services for a number of corporations did not ipso facto have a trade or business distinct from investment with the result that a loan made to one of the corporations was a nonbusiness debt, the Court stated:

> When the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business since investment is not a trade or business and the return to the taxpayer, though substantially the product of his services, legally arises not from his own trade or business but from that of the corporation. 373 U.S. at 202, 83 S.Ct. at 1174.

In seeking to establish that taxpayer was in the trade or business of making loans, taxpayer stresses her substantial loan-making activities both prior to and after the years involved herein. Taxpayer also points to the fact that substantial collection activity took place during the period, that extensive records were maintained, and that four witnesses testified that taxpayer had a reputation in the community for being in the lending business.

Although it is true that taxpayer may have been in the business of making loans during the periods in question; this Court is firm in its conclusion that taxpayer was not involved in a continuous course of conduct of making loans, the purpose of which was the derivation of profits. Aside from the loans to MacKay, there were only seven other loans made during this period, and only one of these was interest bearing. Neither the taxpayer nor anyone employed by her regularly devoted a significant portion of his time to the activities connected with the making of loans. Henderson, who managed not only the taxpayer's interests, but also a lumber business, located elsewhere in Texas, devoted only a very small portion of his time to the servicing of these loans. Furthermore, other indicia of a genuine loan business were absent: neither the taxpayer nor anyone acting on her behalf ever actively sought out the loan business; taxpayer never advertised that she was in a business of lending and did not maintain an office for that purpose; taxpayer's activities in connection with the making of loans during this period were not treated as a business separate from her other interests—a separate office was not maintained, separate business books of account were not kept, and statements showing profit or loss from loan activities were not prepared; and, finally, most of the borrowing was either by social or business acquaintances.

### III

Even if taxpayer was engaged in the trade or business of making loans, it is well established that the particular loan activities involved herein must be "proximately" related to her loan activi-

ties. Thus, in United States v. Whipple, supra, the Court stated:

> [The nonbusiness bad debt provision] was intended to accomplish far more than to deny full deductibility to the worthless debts of family and friends. It was designed to make full deductibility of a bad debt turn upon its proximate connection with activities which the tax laws recognized as a trade or business, a concept which falls far short of reaching every income or profit making activity.

> \* \* \* \* \* \*

> Even if taxpayer demonstrates an independent trade or business of his own, care must be taken to distinguish bad debt losses arising from activities peculiar to an investor concerned with, and participating in, the conduct of the corporate business. 373 U.S. at 201, 202, 83 S.Ct. at 1173.

Thus, if taxpayer could prevail upon the theory that these advances were loans as opposed to contributions to capital and, furthermore, if taxpayer had established that, during the years in question, she was in the business of making loans within the meaning of Section 166 of the Internal Revenue Code, the facts and circumstances surrounding the transactions in question clearly indicate these "loans" were not "proximately" related to her loan activities. For example, the evidence is quite strong that these advances were made with a view to helping taxpayer's grandson-in-law, Malcolm Alexander, get started in the foundry business in Lufkin. The record is replete with references to taxpayer's desire to see the business grow and prosper and to see young Alexander make a success of it. Prior to the creation of MacKay, taxpayer had expressed her desire to see Alexander get started in Lufkin, and offered financial assistance to the Mac-Kay Corporation until it got off the ground. Even when the corporation was an obvious failure and Henderson had determined operations should be stopped, taxpayer expressed her regret and urged Henderson to provide further assistance and financing. Her motives, therefore, were clearly not those of an investor seeking the fair return of profit in connection with a money-lending business. This is underscored by the fact that taxpayer received no compensation for the risk she incurred in guaranteeing Mac-Kay's obligations to the Lufkin National Bank and that the four percent interest rate that MacKay agreed to pay taxpayer—the same rate that the bank had charged in a riskless situation (riskless because of taxpayer's guarantee)—was wholly disproportionate to the great risk which the taxpayer actually incurred. Moreover, as pointed out previously, the taxpayer did not treat these transactions as arms-length investment activity; she did not insist on her rights as a creditor; no interest or principal was ever paid since it was generally understood that interest and principal would be repayable only if and when the corporation had profits, whereas at the same time all other creditors were paid in full whenever MacKay's obligations to them fell due; and finally, after the merger with Indiana Foundry taxpayer allowed Henderson and Alexander to retain the proceeds they received from the subsequent stock redemption which resulted in a 100 percent gain to them over what they had originally invested in MacKay, even though not a cent was paid to her with respect to the notes which should have had first priority of satisfaction from MacKay's assets.

The judgment is reversed and the case is remanded to the District Court for the entry of judgment in favor of the United States.