T.C. Memo. 2020-68

UNITED STATES TAX COURT

DAVID A. NOVOSELSKY AND CHARMAIN J. NOVOSELSKY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22400-13.                    Filed May 28, 2020.

David A. Novoselsky and Charmain J. Novoselsky, pro sese.

<u>Alexander R. Roche</u>, <u>Mayer Y. Silber</u>, and <u>Jay D. Adams</u>, for respondent.

MEMORANDUM OPINION

LAUBER, <u>Judge</u>:  With respect to petitioners' Federal income tax for 2009

and 2011, the Internal Revenue Service (IRS or respondent) determined deficien-

cies of $276,398 and $263,049, respectively, and accuracy-related penalties under

[*2] section 6662(a) of $55,280 and $52,610, respectively.[1] During 2009 and 2011 petitioner husband (Mr. Novoselsky or petitioner) practiced law with a focus on class action litigation. In those years he executed "litigation support agreements" with various individuals and entities. Under these agreements the counter-party made an upfront payment to support the cost of litigation. If the litigation was successful, petitioner was obligated to return to the counter-party, from his award of attorney's fees and costs, the counter-party's initial payment plus a premium. If the litigation was unsuccessful, petitioner had no obligation to pay the counter-party anything. Petitioners did not report the payments thus received as gross receipts on the Schedules C, Profit or Loss From Business, for Mr. Novoselsky's law practice.

The IRS selected petitioners' returns for examination and determined the deficiencies and penalties shown above. After concessions,[2] the principal ques-

_____

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all dollar amounts to the nearest dollar.

[2]The parties filed a stipulation of settled issues in which they agreed that petitioners for 2009: (1) were not entitled to a Schedule C deduction of $142,414 for legal and professional expenses and (2) had unreported Schedule C gross receipts of $235,906 (apart from the litigation support payments addressed in this opinion). All other adjustments are purely computational.

**[\*3]** tions we must decide are whether the litigation support payments were loans, as petitioners contend, or constituted gross income currently taxable under section 61(a), and whether petitioners are liable for accuracy-related penalties. We answer both questions in respondent's favor.

## Background

The parties submitted this case for decision without trial under Rule 122. Relevant facts have been stipulated or are otherwise included in the record. See Rule 122(a).[3] Petitioners resided in Wisconsin when they filed their petition. Absent stipulation to the contrary, appeal of this case would lie to the U.S. Court of Appeals for the Seventh Circuit. See sec. 7482(b)(1)(A). Where relevant to the discussion, we note that court's precedent. See Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).

## I.     Mr. Novoselsky's Business

During 2009-2011 petitioner practiced law in the Chicago, Illinois, metropolitan area. Through his professional and personal relationships he was able to secure private financing for some of his cases through litigation support agree-

---

[3]On July 26, 2018, respondent filed a request for admissions, to which petitioners did not timely respond. See Rule 90(c). However, the parties have through their stipulations and briefing expressed agreement about all relevant facts. Accordingly, we need not and do not rely on any deemed admissions for purposes of this opinion.

**[*4]** ments. The counter-parties who supplied this support were plaintiffs in litigation being handled (or proposed to be handled) by petitioner, persons whose interests were economically aligned with the interests of such plaintiffs, lawyers with whom petitioner had fee-sharing arrangements, or individuals seeking a high return on a speculative investment.[4]

During 2009 and 2011 petitioner executed litigation support agreements with at least nine individuals or entities. These agreements, which differed somewhat in form, may be summarized as follows.

A.    Friedman-Vainder and Similar Agreements

On or around August 1, 2009, petitioner executed a "Letter Agreement for Litigation Support" with Dr. Neil Friedman and Dr. John Vainder. Each doctor thereby agreed to pay petitioner $30,000 as litigation support. The agreement stated that each payment

> shall be a litigation support loan to NOVOSELSKY made on a non-recourse basis and is used to pay for all time and expenses incurred by NOVOSELSKY in pursuant [sic] of this litigation. Said payment shall be repaid to FRIEDMAN and VAINDER at the successful conclusion of this litigation with annual interest to be paid as simple

---

[4]We note that the Illinois Rules of Professional Conduct generally prohibit a lawyer from splitting attorney's fees with a non-lawyer. See Ill. S. Ct. R. Prof'l Conduct 5.4. This rule is designed "to protect the lawyer's professional independence of judgment." See id. cmt. 1.

**[*5]** interest at the rate of eighteen percent (18%) per annum calculated pro rata as of the date of concluding this litigation.

On September 10, 2009, petitioner executed with Dr. Mark Schacht a substantially similar agreement whereby Dr. Schacht advanced $100,000 to petitioner for litigation support. On January 19, 2011, petitioner executed with Dr. Friedman and Dr. Peter Vaselopulos a substantially similar agreement, whereby each advanced $100,000 to petitioner for litigation support. Petitioner actually received, during 2009 or 2011 respectively, the payments specified in each agreement.

The agreement with Dr. Schacht specified that the litigation support payment would be used to enable petitioner "to file one or more causes of action * * * contesting the use and accounting/reporting of Court fees by Cook County and its public officials," allegedly in violation of Illinois law. The agreements with the other three doctors specified that their payments would be used to enable petitioner "to file one or more causes of action * * * challenging current or contemplated Illinois fee statutes adding fees" for medical professionals and other groups, allegedly in violation of Illinois and Federal law.

On December 10, 2011, Drs. Friedman and Schacht executed, on behalf of Metro Chicago Surgical Oncology, LLC (Metro Chicago), an agreement whereby Metro Chicago advanced $150,000 to petitioner to support litigation against

[*6] Northshore University Healthcare Systems (Northshore). This agreement stated that Metro Chicago "will retain the Services of * * * [Novoselsky] to represent the interests of METRO CHICAGO * * * as a plaintiff in a lawsuit to be filed or as intervening party in existing litigation and as representative" of other medical practices allegedly aggrieved by Northshore's actions.

Like the other agreements described above, the Metro Chicago agreement stated that the funds were being advanced to petitioner "on a nonrecourse basis" and would be repaid "at the successful conclusion of this litigation." The only substantive difference was that interest was to be calculated at the Federal discount rate rather than at 18%. On December 20, 2011, petitioner received from Metro Chicago a check for $150,000.

B.     Seidman Agreement

On January 20, 2009, petitioner executed a "Letter Agreement" with an attorney, Steven Seidman, amending the terms of their existing arrangement for splitting fees in a case captioned "Hale v. Cook County." Attorney Seidman thereby agreed to advance $250,000 to petitioner for litigation support, with that sum to "be taken as a credit against any fees to be recovered by Novoselsky Law Offices." They agreed to "a 50/50 division of attorney's fees less expenses to be shared on the same basis." They further agreed that they would "amend the law-

**[*7]** suit to bring additional causes of action," with Attorney Seidman having the option to "participate in the additional causes of action on a basis to be agreed." Petitioner received payments totaling $250,000 from Attorney Seidman between January and April 2009.

### C. Markoff-Lidawer Agreement

On July 6, 2011, petitioner executed a "Second Amended Loan Agreement" with Robert Markoff and Annette Lidawer, both of whom were attorneys. This document superseded two agreements the parties had executed earlier in 2011. Attorneys Markoff and Lidawer thereby agreed to advance $500,000 to petitioner for litigation support, with the advance to "be repaid in the sum of $1,000,000" in lieu of interest.

The parties agreed that this advance would be "repaid out of any costs and/or fees awarded by any Court in the cases listed in Exhibit A attached hereto and any other cases which the parties shall jointly pursue." (The record does not include a copy of "Exhibit A," so the nature of the litigation supported is unclear.) The parties agreed that "this is a nonrecourse loan in that Novoselsky shall not be personally liable for the repayment beyond the proceeds of any attorney fees and/or costs awarded by the court." During 2011 Attorneys Markoff and Lidawer paid petitioner $400,000 of the agreed-upon sum.

**[*8]**   D.     Atkins Agreement

On November 10, 2011, Dr. Edward Atkins gave petitioner a check for $250,000.  The next day petitioner executed a "Letter Agreement" with Dr. Atkins that characterized this advance as a "retainer fee" in connection with "the Shvets litigation."  (This litigation, like the litigation supported by Dr. Schacht, appears to have been a class action challenging allegedly improper use of court fees by Illinois public officials.)  The reference to the advance as a "retainer fee" suggests that Dr. Atkins was a client, although he does not appear to have been a plaintiff in the Shvets litigation.  The agreement stated that Dr. Atkins would be repaid his "retainer fee," plus a pro-rated premium of $42,500 per year, "before Novoselsky Law Offices or David Novoselsky personally receive any fees either hourly or reward based on the Shvets litigation."

Respondent contends (and petitioners do not dispute) that, under the terms of each agreement discussed above, Mr. Novoselsky's payment obligation was contingent on the success of the litigation that the counter-party was supporting. In other words, Mr. Novoselsky was not obligated to repay the funds advanced to him unless the litigation in question yielded proceeds in the form of attorney's fees and/or costs.  If the litigation was unsuccessful, Mr. Novoselsky was not obligated

[*9] to repay his counter-party anything.[5]  Under these agreements Mr. Novoselsky received litigation support payments totaling $410,000 in 2009 and $1 million in 2011.[6]

## II.    IRS Examination

Petitioners filed timely joint returns on Forms 1040, U.S. Individual Income Tax Return, for 2009 and 2011.  They did not report any of the litigation support payments discussed above as gross receipts on the Schedules C for Mr. Novoselski's law practice.  For 2009 they reported a Schedule C profit of $255,576 and a

---

[5]With respect to each agreement respondent requested a finding of fact that, "if Novoselsky did not receive a fee at the conclusion of the litigation identified in the * * * [Litigation Support Agreement], Novoselsky did not have an obligation to repay."  Petitioners did not object to this requested finding of fact except to say that respondent should have used the word "monies" rather than "a fee."  Petitioner agreed that he "would be obliged to pay the Litigation Support Agreements or Letter Agreements at the conclusion of the litigation out of monies paid to him through a favorable judgment or settlement."  At no point in petitioners' opening or answering briefs did they dispute respondent's contention that repayment of the counter-parties' advances was contingent on the success of the litigation they were supporting.

[6]The litigation support payments for 2011 discussed in the text exceed the amount of unreported income for 2011 that respondent determined in the notice of deficiency.  Petitioner appears to have executed another litigation support agreement in 2011, with Arnold Newman, which yielded petitioner an advance of $175,000.  Respondent takes no position concerning the proper characterization of that agreement and has not asserted an increased deficiency.  See infra note 12.

**[*10]** tax liability of $27,057. For 2011 they reported a Schedule C profit of $69,440 and a tax liability of zero.

The IRS selected petitioners' returns for examination and assigned them to a revenue agent (RA) in early 2013. The assessment period of limitations for 2009 was set to expire on October 15, 2013. See sec. 6501(a). Petitioners declined to extend the limitations period, so in June 2013 the RA proceeded to close the case.

On June 11, 2013, the RA completed a Civil Penalty Approval Form reflecting his recommendation that the IRS assert penalties, for 2009 and 2011, for substantial understatements of income tax. See sec. 6662(a), (b)(2), (d). That form was signed by the RA's immediate supervisor, Group Manager Sabin, on June 12, 2013. The RA sent petitioners a closing letter, likewise dated June 12, 2013, indicating that he was issuing the examination report because petitioners had declined to extend the limitations period. The RA attached to his letter a Form 4549-A, Income Tax Discrepancy Adjustments, dated June 11, 2013, reflecting the deficiencies and accuracy-related penalties.

The RA's closing letter advised petitioners that they would shortly receive a notice of deficiency enabling them to petition this Court. On June 24, 2013, the IRS issued petitioners a notice of deficiency reflecting the adjustments to income

**[*11]** and accuracy-related penalties stated on the Form 4549-A.  Petitioners timely petitioned this Court for redetermination.

III.    Bankruptcy Court and Tax Court Proceedings

On July 18, 2014, Mr. Novoselsky filed for bankruptcy in the U.S. Bankruptcy Court for the Eastern District of Wisconsin.  On October 29, 2014, respondent filed a Notice of Proceeding in Bankruptcy.  By order dated October 31, 2014, we ordered proceedings in this case temporarily stayed pursuant to 11 U.S.C. sec. 362(a)(8) (2012).

The United States filed a claim in petitioner's bankruptcy for the 2009 and 2011 deficiencies and penalties determined in the notice of deficiency.  Petitioner did not list the counter-parties to the litigation support agreements as creditors in his bankruptcy petition.  Nor did he list, on the schedules he filed with the Bankruptcy Court, his contingent payment obligations to those counter-parties as claims against his bankruptcy estate.

On November 2, 2015, the United States filed a complaint in the bankruptcy case objecting to petitioner's discharge.  See id. sec. 727(a)(4).  It contended that he had made false oaths by (among other things) failing to list the counter-parties to the litigation support agreements as creditors.  Petitioner moved for partial summary judgment in that adversary proceeding, contending that the United States

**[*12]** should be estopped, by the Commissioner's position in the instant case, from taking the position that those agreements gave rise to claims against his bankruptcy estate.

On December 8, 2016, the bankruptcy court denied petitioner's motion for partial summary judgment. It noted that petitioner himself took the position, in his petition to this Court, that the litigation support agreements gave rise to "loans." In any event the Bankruptcy Court ruled that estoppel did not apply: "[T]he United States' position that the loans are income for Federal income tax purposes if a taxpayer's obligation to repay depends upon a contingency does not logically entail that the loans are not claims for purposes of Title 11 which a debtor is obligated by 11 U. S. C. § 521(a) to schedule."

In 2017 petitioner submitted a written waiver of discharge pursuant to 11 U.S.C. sec. 727(a)(10). On September 5, 2017, the bankruptcy court approved the waiver, ruling that "[t]he debtor will not receive a discharge in this case." On November 9, 2017, we accordingly lifted the bankruptcy stay. See id. sec. 362(c)(2); Smith v. Commissioner, 96 T.C. 10, 17 (1991).

After the stay was lifted, the parties engaged in discovery. On March 25, 2019, they filed (and we granted) a motion to submit the case without trial under Rule 122. Multiple rounds of briefing ensued. The issues remaining in dispute

**[\*13]** are whether the payments Mr. Novoselsky received pursuant to the litigation support agreements were gross income under section 61(a) and whether petitioners are liable for accuracy-related penalties.

## Discussion

The parties submitted this case for decision without trial under Rule 122(a). The fact that a case has been submitted under Rule 122(a) "does not alter the burden of proof, or the requirements otherwise applicable with respect to adducing proof, or the effect of failure of proof." Rule 122(b).

I.    Unreported Income

A.    Burden of Proof

The Commissioner's determination of tax liability is generally presumed correct. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). In order for this presumption to attach in unreported income cases, the Commissioner must show a "rational foundation" for the IRS' determination that the taxpayer received such income. Pittman v. Commissioner, 100 F.3d 1308, 1313 (7th Cir. 1996), aff'g T.C. Memo. 1995-243. "Once the Commissioner makes the required threshold showing, the burden shifts to the taxpayer to prove by a preponderance of the evidence that the Commissioner's determinations are arbitrary or erroneous."

[\*14] Walquist v. Commissioner, 152 T.C. 61, 67-68 (2019) (citing Helvering v. Taylor, 293 U.S. 507, 515 (1935)); Tokarski v. Commissioner, 87 T.C. 74 (1986).

The record shows (and petitioners do not dispute) that Mr. Novoselsky actually received litigation support payments of at least $410,000 and $1 million during 2009 and 2011, respectively. Respondent has therefore established a rational foundation for his determination that petitioners received unreported income. The burden of proof thus shifts to them.[7]

B.     Loans vs. Income

Section 61(a) defines gross income as "all income from whatever source derived," including income derived from business. Petitioners concede that Mr.

---

[7]Petitioners contend that respondent bears the burden of proof with respect to establishing that the litigation support payments were gross income because it is a "new matter." See Rule 142(a)(1) ("[I]n respect of any new matter, * * * [the burden of proof] shall be upon the respondent."). A theory presented to sustain a deficiency "is treated as a new matter when it either alters the original deficiency or requires the presentation of different evidence." Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 507 (1989). "A new theory which merely clarifies or develops the original determination is not a new matter" for this purpose. Ibid. The notice of deficiency determined that petitioners had unreported Schedule C gross receipts, stating: "Retainers and Fees are reportable in the year in which payment is received." Respondent's position on brief is that the litigation support payments constituted those unreported gross receipts and should have been included in income when received. This position is entirely consistent with the determination in the notice of deficiency and requires the presentation of precisely the same evidence. It is not a new matter on which respondent has the burden of proof.

[*15] Novoselsky received, in connection with his business, litigation support payments totaling at least $410,000 during 2009 and $1 million during 2011. As cash method taxpayers, petitioners were required to include those sums in gross income unless the receipts were nontaxable. See sec. 1.451-1(a), Income Tax Regs. Petitioners' primary argument is that the receipts were nontaxable loan proceeds.

Because a genuine loan is accompanied by an obligation to repay, loan proceeds do not constitute income to the taxpayer. Commissioner v. Tufts, 461 U.S. 300, 307 (1983). For this rule to apply, however, the obligation to repay "must be unconditional and not contingent upon some future event." Frierdich v. Commissioner, 925 F.2d 180, 185 (7th Cir. 1991) (citing United States v. Henderson, 375 F.2d 36, 39 (5th Cir. 1967)), aff'g T.C. Memo. 1989-393. As the Fifth Circuit stated in Henderson, 375 F.2d at 39: "Perhaps the most important underlying principle is that no valid debt exists unless there is an unconditional obligation of another to pay * * * a definite sum of money."

Where an obligation to pay arises only upon the occurrence of a future event, we have consistently held that a valid debt does not exist for Federal tax purposes. For example, in Taylor v. Commissioner, 27 T.C. 361 (1956), aff'd, 258 F.2d 89 (2d. Cir. 1958), the taxpayer advanced funds to her nieces and nephew to

[*16] open securities accounts, and they gave her notes agreeing to repay the advances. We held that the advances were not loans because repayment was "conditional upon the profitable management of the accounts," noting that "[a] valid loan does not exist where there is a conditional obligation to repay." Id. at 368.

In Clark v. Commissioner, 18 T.C. 780 (1952), aff'd, 205 F.2d 353 (2d Cir. 1953), the taxpayer advanced funds to his wife to purchase stock in a newspaper company by which she was employed. She was "obliged to repay the sum only if the newspaper earned sufficient profits and she received sufficient dividends to make repayment." Id. at 782. Assuming arguendo that an obligation existed, we held that "such obligation would not have constituted a debt since admittedly it was subject to a contingency that never occurred." Id. at 783.[8]

---

[8]Accord, e.g., Haag v. Commissioner, 88 T.C. 604, 616 (1987) ("[T]o constitute true loans there must have been, at the time the funds were transferred, an unconditional obligation on the part of the transferee to repay the money, and an unconditional intention on the part of the transferor to secure repayment."), aff'd, 855 F.2d 855 (8th Cir. 1988); Mercil v. Commissioner, 24 T.C. 1150, 1153 (1955) ("There must be an unconditional obligation to pay, or, stated otherwise, the amount claimed as the debt must be certainly and in all events payable."); Winter v. Commissioner, T.C. Memo. 2010-287, 100 T.C.M. (CCH) 604, 609-610 (holding that the unearned portion of a bonus was not a loan where the employee was obligated to repay the advance "if and only if he quit or was fired for cause within five years").

**[*17]** The same analysis applies to payment obligations conditioned on the outcome of litigation. For example, in Bercaw v. Commissioner, 165 F.2d 521, 525 (4th Cir. 1948), the taxpayer advanced funds to a guardian for the purpose of commencing litigation, with the guardian agreeing to repay the advance "from any funds recovered by the suit [in] an amount equivalent to such advance." The Fourth Circuit cited the general principle that "[t]he term 'indebtedness' as used in the Revenue Act implies an unconditional obligation to pay." Ibid. (quoting Gilman v. Commissioner, 53 F.2d 47, 50 (8th Cir. 1931), aff'g 18 B.T.A. 1277 (1930)). It held that the taxpayer's advance was not a "debt" because "[t]he guardian's duty to repay the money only arose in the event of a successful termination of the litigation, and that event never took place." Ibid. We have similarly held that purported promissory notes did not give rise to loans where repayment "was to be made only when, if, and to the extent that * * * [the transferee] realized, through judgment or settlement or otherwise, proceeds from the prosecution of * * * [a specified] lawsuit." Estate of Paine v. Commissioner, T.C. Memo. 1963-275, 22 T.C.M. (CCH) 1383, 1389.

The facts of the instant case are indistinguishable in substance from the facts of the cases discussed above. Petitioner during 2009 and 2011 received total advances in excess of $1.4 million with the understanding that he would use these

[*18] funds to commence or continue specified litigation. The agreements made clear that the advances were repayable out of the attorney's fees and costs petitioner hoped to receive upon "the successful conclusion of this litigation." Petitioners do not dispute that Mr. Novoselsky had no obligation to pay the counter-parties anything if the litigation yielded no proceeds. Because he did not have an "unconditional obligation * * * to pay * * * [the counter-parties] a definite sum of money," the litigation support agreements did not give rise to loans for Federal income tax purposes. See Henderson, 375 F.2d at 39.[9]

We would reach the same conclusion under a multi-factor approach, which respondent suggests might be an alternative mode of analysis. Whether an advance of funds constitutes a "loan" for Federal tax purposes is a question that arises in a variety of contexts. An advance by a shareholder to his corporation may be a loan or a capital contribution. An advance by a corporation to its shareholder may be a loan or a dividend. An advance by a mother to her son may be a

---

[9]Lawyers who handle contingent fee cases commonly incur litigation expenses that they expect (or at least hope) will be repaid upon successful conclusion of the litigation. In such situations the question may arise whether the lawyer's expenditures are currently deductible under section 162(a) or, rather, should be characterized as loans to the client on whose behalf the litigation is conducted. Cf. Herrick v. Commissioner, 63 T.C. 562, 566-569 (1975); Canelo v. Commissioner, 53 T.C. 217, 224 (1969), aff'd, 447 F.2d 484 (9th Cir. 1971). Those situations, where the lawyer is the payor rather than the payee, present a question different from the unreported income question involved here.

**[*19]** loan or a gift. And as here, an advance to a lawyer by a client or business associate may be a loan or taxable income.

Courts have used a variety of tests to guide the determination of whether particular types of advances should be treated as "loans" for Federal tax purposes. In Busch v. Commissioner, 728 F.2d 945, 948 (7th Cir. 1984), aff'g T.C. Memo. 1983-98, the Seventh Circuit enunciated an eight-factor test for use in deciding whether a withdrawal by a shareholder from his corporation should be treated as a loan or a dividend. In Ill. Tool Works Inc. v. Commissioner, T.C. Memo. 2018-121, at *29, we considered 14 factors in evaluating whether a transfer of funds between affiliated corporations should be characterized as a dividend or a loan.[10]

Outside the corporation-shareholder context courts have considered different sets of factors. In Welch v. Commissioner, 204 F.3d 1228 (9th Cir. 2000), aff'g T.C. Memo. 1998-121, the question was whether funds received by the tax-

---

[10]Other Circuits have applied somewhat different multi-factor tests to determine whether an advance should be treated as a loan as opposed to a dividend or a capital contribution. See, e.g., Tex. Farm Bureau v. United States, 725 F.2d 307, 311 (5th Cir. 1984) (setting forth a 13-factor test to determine whether an advance by a shareholder to his corporation was a loan or a capital contribution); Alterman Foods, Inc. v. United States, 505 F.2d 873, 877 n.7 (5th Cir. 1974) (listing nine factors considered by courts to determine whether a payment by a subsidiary corporation to its parent was a loan or a dividend); Dillin v. United States 433 F.2d 1097, 1100 (5th Cir. 1970) (employing 11-factor test to determine whether an advance by a corporation to a shareholder was a loan or a dividend).

**[*20]** payer from a business associate constituted taxable income or a loan. The Ninth Circuit identified seven factors that may be relevant "in assessing whether a transaction is a true loan":

> (1) whether the promise to repay is evidenced by a note or other instrument; (2) whether interest was charged; (3) whether a fixed schedule for repayments was established; (4) whether collateral was given to secure payment; (5) whether repayments were made; (6) whether the borrower had a reasonable prospect of repaying the loan and whether the lender had sufficient funds to advance the loan; and (7) whether the parties conducted themselves as if the transaction were a loan. [Id. at 1230 (citing inter alia Frierdich, 925 F.2d at 182)].

Our Court has applied the same seven factors to determine whether a payment constituted taxable income or a loan. See Todd v. Commissioner, T.C. Memo. 2011-123, 101 T.C.M. (CCH) 1603, 1605, aff'd, 486 F. App'x 423 (5th Cir. 2012); see also Saunders v. Commissioner, T.C. Memo. 1982-655 (holding that an advance constituted taxable compensation rather than a loan), aff'd, 720 F.2d 871 (5th Cir. 1983).

As the Seventh Circuit has recognized, "no single factor is controlling" when employing these tests. Busch, 728 F.2d at 948. Indeed, "[m]ulti-factor tests are not 'talismans of magical power, and the most that can be said is that they prove a source of helpful guidance.'" MoneyGram Int'l, Inc. & Subs. v. Commissioner, 153 T.C. __, __ (slip op. at 51) (Dec. 3, 2019) (quoting Dillin v. United

**[*21]** <u>States</u>, 433 F.2d 1097, 1100 (5th Cir. 1970)).  At bottom we must decide whether "there [was] a genuine intention to create a debt, with a reasonable expectation of repayment." <u>Litton Bus. Sys., Inc. v. Commissioner</u>, 61 T.C. 367, 377 (1973).  This determination is "purely a question of fact." <u>Busch</u>, 728 F.2d at 949.

The litigation support agreements that petitioner executed with his counterparties generally refer to the advances as "loans."  But petitioner did not execute a formal promissory note; no fixed schedule for repayments was established; petitioner provided no collateral or security; and no payments of principal were ever made.  Some of the agreements provided for interest, others specified a fixed-dollar success premium.  But no interest or other amount was ever paid.  The counter-parties evidently viewed petitioner's personal ability to repay as irrelevant:  They made the loans nonrecourse, with the advances being repayable only out of future litigation proceeds.

Most importantly, the parties did not conduct themselves as if the transactions were bona fide loans.  In each instance they agreed that petitioner had no obligation to repay the advance unless the litigation was successful.  Because repayment was contingent on the uncertain outcome of litigation, the funds were not "advanced with reasonable expectations of repayment regardless of the success of

**[*22]** the venture." <u>Ill. Tool Works</u>, at *47 (quoting <u>Gilbert v. Commissioner</u>, 248 F.2d 399, 406 (2d Cir. 1957), <u>remanding</u> T.C. Memo. 1956-137).

Given these facts, the Seventh Circuit's opinion in <u>Frierdich</u> seems the most relevant precedent. The taxpayer there, an attorney, received $100,000 from a client who had hired the attorney to handle the estate of her late husband. <u>Frierdich</u>, 925 F.2d at 181. The parties executed a promissory note providing for 8% annual interest, but there was no fixed schedule for repayment of principal or interest. Rather, both were "due and payable at the time of payment of attorney's fees due * * * [the attorney] subject to [the] closing of the estate" of the client's deceased husband. <u>Id.</u> at 182. The note authorized the client to deduct, from the estate legal fees ultimately payable to the attorney, the $100,000 principal amount "plus accrued interest." <u>Ibid.</u> The attorney had made no payments on the supposed loan by the time the notice of deficiency was issued to him, six years after the note was executed.

Our Court in <u>Frierdich</u> noted that objective multi-factor tests may be "instructive" in determining the parties' intent and the character of an advance for Federal tax purposes. <u>Frierdich</u>, 57 T.C.M. (CCH) at 1133 n.4. In ascertaining whether the parties intended a true loan, we cited such factors as the existence vel non of a debt instrument; provisions for security, interest, and a fixed repayment

[*23] schedule; the taxpayer's ability to repay the loan; and whether loan repayments were in fact made. Id. at 1133 n.4, 1135. "In addition," we stated, "the obligation to repay must be unconditional and not contingent upon some future event." Id. at 1133 (citing Henderson, 375 F.2d at 39). Placing emphasis on the terms of the Frierdich promissory note, which explicitly linked repayment to the attorney's closing of the estate, we held that the advance "was not a loan, but rather, an advancement for legal services to be rendered in the future," and as such was currently includible in the taxpayer's income. Id. at 1135.

The Seventh Circuit affirmed, reviewing our decision under a "clearly erroneous" standard. Frierdich, 925 F.2d at 182. It observed that the promissory note lacked typical loan formalities--e.g., a fixed repayment date, an amortization schedule, and provisions for security--and that the attorney in fact made no payments during the ensuing six years. Id. at 184. And the Court of Appeals agreed with our conclusion that "the repayment of a loan must be unconditional and not contingent upon some future event." Id. at 185 (citing Henderson, 375 F.2d at 39).

In Frierdich repayment of the loan was "expressly conditioned on the closing of * * * [the] estate" of the client's deceased husband. Ibid. And the client had the right to set off, against the estate fees due the attorney, the principal and accrued interest on the "loan." Ibid. Given "this purposeful linkage between the

**[\*24]** estate fee, the loan, and \* \* \* [the client's] stated right to setoff," the Seventh Circuit upheld our determination that the $100,000 transfer was not a loan but was "an advance payment by the estate for legal services, permitting Frierdich to have tax-free use of $100,000 for what turned out to be many years." Id. at 185.

The facts of this case closely resemble those in Frierdich. Petitioner's counter-parties were clients, medical professionals with interests aligned to the interests of his clients, or lawyers with whom he had existing fee-sharing agreements. As in Frierdich, repayment of the supposed loans was explicitly linked to successful conclusion of the legal matters that petitioner had been retained to handle. Indeed, the facts here are stronger for respondent than in Frierdich. In this case, repayment of the advances was not just linked to successful conclusion of the litigation; repayment was not required at all unless the litigation was successful.

We accordingly conclude that the advances petitioner received under the litigation support agreements were not loans for Federal income tax purposes. Rather, they were advance payments for the legal services that the counter-parties expected him to perform. As such, the advances were includible in petitioner's income when received as gross income under section 61(a).

[*25] C.     Petitioners' Other Arguments

Petitioners urge that the IRS should be estopped from contending that the litigation support agreements gave rise to gross income, citing the position taken by the United States in the bankruptcy case. This is essentially the same argument that Mr. Novoselsky advanced in bankruptcy court, viz., that the agreements with his counter-parties could not give rise to "claims" for bankruptcy purposes unless they gave rise to "loans" for Federal income tax purposes. Like the bankruptcy court, we find this argument wholly unpersuasive.

"Judicial estoppel prevents a party that has taken one position in litigating a particular set of facts from later reversing its position when it is to its advantage to do so." Levinson v. United States, 969 F.2d 260, 264 (7th Cir. 1992). For judicial estoppel to apply, "the later position must be clearly inconsistent with the earlier position." Ibid.

The Bankruptcy Code defines a "claim" as a "right to payment, whether or not such right is * * * fixed * * *[or] contingent." 11 U.S.C. sec. 101(5)(A). Petitioner's counter-parties had contingent rights to payment from him because he was obligated to return their advances (with a premium) if the litigation they supported was successful. The counter-parties thus had "claims" against his estate for bankruptcy purposes, as the bankruptcy court reasoned.

**[\*26]** For tax purposes, by contrast, an advance "must be unconditional and not contingent upon some future event" in order to constitute a "loan." Frierdich, 925 F.2d at 185.  The Government's position that the counter-parties had "claims" against Mr. Novoselsky's bankruptcy estate is by no means inconsistent with respondent's position that their advances to him were not "loans."  The doctrine of judicial estoppel therefore does not apply.

Finally, petitioners assert that the counter-parties' advances were excludable from gross income as "gifts" or as deposits held in "trust."  Neither argument passes the straight-face test.  Nothing in the litigation support agreements suggests that the counter-parties advanced funds to petitioner out of a "detached and disinterested generosity" or "out of affection, respect, admiration, charity or like impulses." Commissioner v. Duberstein, 363 U.S. 278, 285 (1960).  Quite the contrary:  The counter-parties demanded a return on their investment, viz., interest as high as 18% or a fixed-dollar payment as high as $500,000.  These were plainly speculative profit-seeking transactions, not gifts.

"As a general rule, funds that a taxpayer receives in trust for another person are not includable in the taxpayer's gross income." Canatella v. Commissioner, T.C. Memo. 2017-124, 113 T.C.M. (CCH) 1549, 1553 (citing Ford Dealers Advert. Fund, Inc. v. Commissioner, 55 T.C. 761, 771 (1971), aff'd, 456 F.2d 255

**[*27]** (5th Cir. 1972). But the counter-parties plainly did not advance funds with the expectation that petitioner would hold those funds in trust for them (or anyone else). Rather, they denominated the payments "litigation support" and expected that petitioner would <u>spend</u> the money to conduct the litigation they had specified in the agreement.

The agreements stated (for example) that the money was to be "used to pay for all time and expenses incurred by NOVOSELSKY in pursuant [sic] of this litigation." If the funds had been meant to be held in trust, Mr. Novoselsky would not have been permitted to keep the money in his personal or business account. <u>See</u> Ill. S. Ct. R. Prof'l Conduct 1.15 (requiring that trust funds be kept separate from the lawyer's own property). Nothing in the record suggests that Mr. Novoselksy held the counter-parties' funds in a separate trust account.[11]

In sum, Mr. Novoselsky during 2009 and 2011 received litigation support payments totaling $1.41 million that were not reported on petitioners' tax returns. Petitioners have failed to carry their burden of proving that these payments were

---

[11]Petitioners err in citing <u>Dowling v. Chi. Options Assocs., Inc.</u>, 875 N.E. 2d 1012 (Ill. 2007), for the proposition that an attorney is not required to segregate client trust funds in a separate account. In <u>Dowling</u>, the Illinois Supreme Court found that advance payments of retainer fees belonged to the firm and thus could not be kept in a separate trust account for the client's funds. <u>Id.</u> at 1018. The court did not suggest that a lawyer was permitted to keep client trust funds in his own account.

[*28] "loans" or were otherwise excludable from gross income. We will accordingly sustain the Commissioner's determinations of unreported income attributable to these payments.[12]

II.     Accuracy-Related Penalties

       A.     Burdens of Production and Proof

       The IRS determined, for 2009 and 2011 respectively, accuracy-related penalties of $55,280 and $52,610 for underpayments attributable to substantial understatements of income tax. See sec. 6662(a), (b)(2), (d)(1)(A). Section 7491(c) generally provides that "the Secretary shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty." This burden requires the Commissioner to come forward with sufficient evidence indicating that imposition of the penalty is appropriate. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Once the Commissioner meets this burden, the burden of proof is on the taxpayer to "come forward with evidence sufficient to

_____

[12]As stated supra note 6, the 2011 litigation support payments we have discussed exceed the amount of unreported income that respondent determined in the notice of deficiency for 2011. Respondent has not moved to amend his pleadings to assert increased deficiencies. Our determinations of unreported income are thus limited to the amounts set forth in the notice of deficiency. See sec. 6214(a); Estate of Petschek v. Commissioner, 81 T.C. 260, 272 (1983), aff'd, 738 F.2d 67 (2d Cir. 1984).

[*29] persuade a Court that the Commissioner's [penalty] determination is incorrect." Id. at 447.

The Commissioner's burden of production under section 7491(c) includes establishing compliance with section 6751(b).  See Chai v. Commissioner, 851 F.3d 190, 217, 221-222 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42; Graev v. Commissioner, 149 T.C. 485 (2017), supplementing and over-ruling in part 147 T.C. 460 (2016).  Section 6751(b)(1) provides that "[n]o penalty under this title shall be assessed unless the initial determination of such assess-ment is personally approved (in writing) by the immediate supervisor of the indi-vidual making such determination."

In Belair Woods, LLC v. Commissioner, 154 T.C. __, __ (slip op. at 23) (Jan. 6, 2020), we held that the "initial determination" of a penalty assessment is typically embodied in a letter "by which the IRS formally notifie[s] * * * [the taxpayer] that the Examination Division ha[s] completed its work and * * * ha[s] made a definite decision to assert penalties."  Once the Commissioner introduces evidence sufficient to show written supervisory approval of a penalty before a formal communication of the penalty to the taxpayer, the burden shifts to the taxpayer to show that the approval was untimely, i.e., "that there was a formal communication of the penalty [to the taxpayer] before the proffered approval" was

[*30] secured.  Frost v. Commissioner, 154 T.C. __, __ (slip op. at 21-22) (Jan. 7, 2020).

    B.    Analysis

Respondent has produced a Civil Penalty Approval Form signed by the RA's immediate supervisor on June 12, 2013.  The definite decision to assert the penalties was communicated to petitioners that same day, in the form of a closing letter dated June 12, 2013, with an attached Form 4549-A showing the penalty calculation.  The Form 4549-A was dated June 11, 2013, but the RA avers in a sworn declaration that this form was not sent to petitioners until the following day, as an attachment to the closing letter.  Respondent has thus met his initial burden of showing timely approval.  See Chadwick v. Commissioner, 154 T.C. __, __ (slip op. at 17-18) (Jan. 21, 2020); Belair Woods, 154 T.C. at __ (slip op. at 23).

The Court invited petitioners to submit a copy of a 30-day letter or similar document, issued to them before June 12, 2013, indicating that the Examination Division had made, at an earlier time, a definite decision to assert penalties.  Petitioners did not do so.  Indeed, it appears that the IRS never issued them a 30-day letter (which would have offered them the opportunity to take their case to the Appeals Office) because they declined to extend the period of limitations, which was about to expire.  See Internal Revenue Manual pt. 8.2.1.3(4) (Oct. 1, 2012) (re-

[*31] quiring that 180 days remain in the assessment limitations period in order for Appeals to consider a case).[13]

We next consider whether imposition of penalties is "appropriate." Higbee, 116 T.C. at 446. For individual taxpayers, the substantial understatement penalty applies if the understatement of income tax for a particular year "exceeds the greater of--(i) 10 percent of the tax required to be shown on the return * * * , or (ii) $5,000." Sec. 6662(d)(1)(A). The record shows (and petitioners do not dispute) that the understatements of income tax determined in the notice of deficiency, which we have sustained, exceed $5,000 and 10% of the total tax required to be shown on petitioners' returns for 2009 and 2011. Respondent has thus carried his burden of production by demonstrating a "substantial understatement of income tax." See sec. 7491(c).

The section 6662 penalty does not apply to any portion of an underpayment "if it is shown that there was a reasonable cause for such portion and that the tax-

---

[13]Even if the RA had sent petitioners a copy of the Form 4549-A on June 11, contrary to his averment, it would not change the analysis. The Form 4549-A shows the calculation of the penalties that the RA was recommending in the Civil Penalty Approval Form. It was not until the closing letter was issued on June 12 that petitioners were formally notified that "the Examination Division had completed its work and * * * had made a definite decision to assert penalties." Belair Woods, 154 T.C. at __ (slip op. at 23). Because the RA's supervisor approved the penalties on June 12, his approval was timely.

[*32] payer acted in good faith with respect to * * * [it]." Sec. 6664(c)(1). The decision as to whether the taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Circumstances that may signal reasonable cause and good faith "include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." Ibid.

Petitioners have put forth no evidence showing reasonable cause for their underpayments. Mr. Novoselsky is an attorney who had the knowledge and education required to determine his tax obligations correctly. He had considerable experience with contingent fee litigation and fee-sharing agreements--close to half of the litigation support payments at issue came from attorneys with whom he had such arrangements--and the proper tax treatment of such payments was not a novel issue for him. He has not advanced (and could not plausibly advance) any "reliance on professional advice" defense. See id. para. (c). Finding that petitioners have not established reasonable cause, we hold that they are liable for accuracy-related penalties.[14]

---

[14]Part of the deficiency for 2009 was attributable to disallowance of Schedule C deductions of $142,414 and unreported Schedule C income of $235,906

(continued...)

[*33] Petitioners' final contention is that penalties and interest should be reduced because the IRS unreasonably protracted Mr. Novoselky's bankruptcy proceedings by opposing his right to a discharge. Section 6404(f)(1) authorizes the Commissioner to abate "any portion of any penalty * * * attributable to erroneous advice furnished to the taxpayer in writing by an [IRS] officer or employee." Petitioners do not allege that they received erroneous advice from the IRS; in any event, we lack jurisdiction to consider abatement of penalties (such as those here) that have not yet been assessed. See sec. 6404(a), (e); Soni v. Commissioner, T.C. Memo. 2013-30, 105 T.C.M. (CCH) 1216, 1220.

Section 6404(e)(1)(A) authorizes the IRS to abate assessed interest on "any deficiency attributable in whole or in part to any unreasonable error or delay by an [IRS] officer or employee * * * in performing a ministerial or managerial act." Any delay occasioned by the IRS' position in the bankruptcy case reflected an exercise in judgment, not a ministerial act. See sec. 301.6404-2(b), Proced. & Admin. Regs. In any event we lack jurisdiction to consider a request for abate-

---

[14](...continued)
(wholly apart from the litigation support payments). See supra note 2. Petitioners conceded these adjustments in full and offered no reasonable cause for their failure properly to report those items.

[*34] ment of interest where no interest has been assessed and no claim requesting abatement has been filed.  <u>See</u> sec. 6404(a), (h).

To implement the foregoing,

<u>Decision will be entered for</u>

<u>respondent</u>.